PAUL H. ACHITOFF    #5279
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai`i 96813-4501
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: achitoff@earthjustice.org

Attorney for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 02 2012

at 10 o'clock and ___ min ___ M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI‘I

| | |
|---|---|
| TURTLE ISLAND RESTORATION NETWORK and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE FISHERIES SERVICE; REBECCA BLANK, in her official capacity as Acting Secretary of Commerce; UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; and KEN SALAZAR, in his official capacity as Secretary of the Interior;<br><br>        Defendants. | ) CIVIL NO. CV12 00594 SOM RLP<br>)<br>) (OTHER CIVIL ACTION)<br>)<br>) COMPLAINT FOR<br>) DECLARATORY AND<br>) INJUNCTIVE RELIEF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     This action challenges the National Marine Fisheries Service's (NMFS's) Final Rule, issued October 4, 2012, implementing new incidental take levels for endangered loggerhead and leatherback sea turtles (Final Rule) in the Hawaiʻi-based shallow-set pelagic longline fishery (Fishery). It also challenges NMFS's January 30, 2012 Biological Opinion (2012 BiOp) assessing the impacts of incorporating these new take levels into Amendment 18 to the Fishery Management Plan (FMP) governing operation of the Fishery.

2.     The Final Rule violates the Magnuson-Stevens Fishery Conservation and Management Act (MSA), and numerous environmental laws with which any FMP amendment must comply. By preparing an inadequate 2012 BiOp, and by authorizing the Fishery to fish in a manner known to kill threatened and endangered sea turtles without an adequate Biological Opinion, NMFS is violating, in addition to the MSA, the Endangered Species Act, 16 U.S.C. § 1531 et seq. (ESA), and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (APA). By failing to assess the effects of the Final Rule on leatherback sea turtles under the National Environmental Policy Act, 42 U.S.C.A. § 4321 et seq. (NEPA), NMFS is violating that statute as well.

3.     This action also challenges the United States Fish and Wildlife Service's (FWS's) issuance on August 24, 2012 of a Special Purpose Permit (Permit) allowing the Fishery to, among other things, catch up to 191 Black-footed and 430 Laysan albatrosses over the Permit's 3-year permit term.

2

Issuance of the Permit was arbitrary, capricious, and contrary to the Migratory Bird Treaty Act of 1918, 16 U.S.C. § 703, et seq. (MBTA), the applicable regulations, and the APA.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction of this action by virtue of 28 U.S.C. § 1331 (actions under the laws of the United States), 28 U.S.C. § 2201-02 (power to issue declaratory judgments in cases of actual controversy), 16 U.S.C. § 1855(f) (review of regulations promulgated under the Magnuson-Stevens Fishery Conservation and Management Act); and 5 U.S.C. § 706 (actions under the APA).

5.  Venue is proper in this district under 28 U.S.C. § 1391(e), because one or more plaintiffs reside in this district, and this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

6.  Plaintiff Turtle Island Restoration Network (TIRN) is a non-profit corporation with its principal place of business in Forest Knolls, California.

3

TIRN is an environmental organization with approximately 7,000 members, many of whom reside in the state of Hawai'i. Each of TIRN's members shares a commitment to the study, protection, enhancement, conservation, and preservation of the marine environment and the wildlife that lives within it. All of TIRN's members spend time in activities devoted to these goals. TIRN's members and staff regularly use the coastal and pelagic waters off the coast of Hawai'i for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities, including wildlife-viewing activities such as swimming, snorkeling, kayaking, scuba diving, and whale watching. TIRN's members and staff include marine biologists who are engaged in the study, protection, enhancement, conservation, and preservation of wildlife including seabirds and sea turtles, as well as professional wildlife photographers, whose livelihood depends in part on the survival of these species and the ability to photograph them in the wild. TIRN's members and staff study, visit, observe, and photograph seabirds and turtles, including the populations at issue in this case, on a regular, ongoing basis and intend to continue to do so in the future. TIRN brings this action on behalf of itself and its adversely affected members and staff.

7.   Plaintiff Center for Biological Diversity (the Center) is a non-profit corporation dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands. The Center has over 39,000

4

members, many of whom reside in the state of Hawai'i, and maintains offices throughout the western United States. The Center's members and staff regularly use the coastal and pelagic waters off the coast of Hawai'i for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities. The Center's members and staff have researched, studied, visited, observed or attempted to observe, photographed or attempted to photograph, and sought protection for seabirds and sea turtles in the waters surrounding Hawai'i, including the populations at issue in this case, and do so on an ongoing basis. The Center's members and staff intend to continue to research, study, visit, observe, photograph and seek protection for these species in the near future. The Center's members and staff derive scientific, recreational, conservation, and aesthetic benefits from the existence of these animals in the wild. The Center brings this action on behalf of itself and its adversely affected members and staff.

8.    Defendant National Marine Fisheries Service (NMFS) is an agency of the National Oceanic and Atmospheric Administration (NOAA) of the United States Department of Commerce, and sometimes is referred to as "NOAA Fisheries." NMFS performs two distinct functions relevant to this lawsuit, through two separate offices, and these functions are governed by distinct legal obligations. NMFS's Office of Protected Resources (NMFS-Protected Resources) is charged with the conservation and management of

5

ocean resources, and is responsible for implementing and enforcing federal environmental laws as they apply to those resources.  NMFS's Office of Sustainable Fisheries (NMFS-Fisheries) is responsible for managing the United States' commercial fisheries, including the Fishery, and in that capacity must comply with the environmental laws in the same manner and to the same extent as any other entity.

9.    When NMFS-Fisheries proposes to take an action that may affect threatened or endangered marine species, it is known as the "action agency." Section 7(a)(2) of the ESA requires that, as such, it first consult with NMFS-Protected Resources—known in this circumstance as the "consulting agency"—to assess the risks such action may present to the survival and recovery of those species, and insure the proposed action is not likely to "jeopardize" them within the meaning of the ESA.  NMFS-Protected Resources prepared and issued the 2012 BiOp and 2012 Incidental Take Statement (2012 ITS).  NMFS-Fisheries issued the Final Rule authorizing fishing in the Fishery under Amendment 18 to the FMP, in accordance with and reliance on the 2012 BiOp and 2012 ITS.

10.  Defendant U.S. Department of Commerce is the federal agency with ultimate responsibility for implementing and enforcing compliance with provisions of law that have been violated as alleged in this Complaint.

11.  Defendant Rebecca Blank is sued in her official capacity as Acting Secretary of Commerce.

12.   Defendant United States Fish & Wildlife Service (FWS) is a bureau within the United States Department of the Interior responsible for implementing the Migratory Bird Treaty Act.  FWS issued the Permit authorizing incidental take of migratory birds in the Fishery.

13.   Defendant United States Department of the Interior is the federal agency with ultimate responsibility for implementing and enforcing compliance with provisions of law that have been violated as alleged in this Complaint.

14.   Defendant Ken Salazar is sued in his official capacity as Director of the United States Department of the Interior.

## STATUTORY BACKGROUND

### The Magnuson-Stevens Fishery Conservation and Management Act

15.  The Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq. ("MSA") governs fishing by U.S. vessels, as well as fishing by foreign vessels within the U.S. Exclusive Economic Zone ("EEZ"). The MSA accomplishes this, in part, through Regional Fishery Management Councils, which propose Fishery Management Plans ("FMPs") to regulate fishing within their region. Each FMP or FMP "amendment" must be approved by NMFS-Fisheries before it becomes operational. Id. § 1852(h)(1). NMFS-Fisheries may only approve an FMP, FMP amendment, or allow any other fishing activity to occur or continue if such an FMP, amendment, or other activity does not violate applicable laws, including the ESA and NEPA. Id. §§ 1853(a)(1)(C), 1854(a)(1).

16.  The MSA provides for judicial review of regulations promulgated by NMFS-Fisheries under the MSA and actions taken under regulations which implement a fishery management plan. Id. § 1855(f). The court shall set aside any such regulation or action if arbitrary, capricious, not in accordance with law, or an abuse of discretion under the APA standard of review, 5 U.S.C. § 706(2).

**The Endangered Species Act**

17. "[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978) (hereinafter TVA). In furtherance of the ESA's goals to conserve species and the ecosystems on which they depend, Congress mandated in Section 2(c) that "'all Federal departments and agencies shall seek to conserve endangered species and threatened species....'" Id. (quoting 16 U.S.C. § 1531(c)) (emphasis omitted). "Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of all methods and procedures that are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'" Id. (quoting 16 U.S.C. § 1532(2) (emphasis in TVA). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184.

**ESA § 7(a)(2)**

18. Section 7(a)(2), 16 U.S.C. § 1536(a)(2), is a critical component of the ESA's statutory and regulatory scheme to conserve endangered and threatened species. Section 7(a)(2) requires, among other things, that every federal agency must determine whether its actions "may affect" any endangered

or threatened species.  If so, and unless it is determined that the "action agency's" proposed actions are unlikely to adversely affect the species, the action agency must formally consult defendant NMFS-Protected Resources (in the case of marine species) as part of its duty to "insure that [its] action is … not likely to jeopardize the continued existence" of that species.  16 U.S.C. § 1536(a)(1), (2); 50 C.F.R. § 402.14.  "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

19.  An action agency's duties under the ESA to conserve endangered species and to avoid jeopardy are not limited to making such efforts as will not interfere with what it deems its "primary mission," such as promoting commercial fisheries.  The "pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  TVA, 437 U.S. at 185.  "[T]he agencies of Government can no longer plead that they can do nothing about it.  *They can, and they must.  The law is clear.*"  Id. at 184 (quoting 119 Cong. Rec. 42913 (1973)) (emphasis in TVA).

10

20. Section 7(a)(2) of the ESA and its implementing regulations require that, once an agency enters formal consultation with NMFS-Protected Resources, the latter must prepare a Biological Opinion. 50 C.F.R. § 402.14. The Biological Opinion must include, among other things, a "detailed discussion of the effects of the action on listed species" and NMFS-Protected Resources' "opinion on whether the action is likely to jeopardize the continued existence of the species...." 50 C.F.R. § 402.14(h)(2), (3).

21. In formulating the Biological Opinion, NMFS-Protected Resources must use the "best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8).

22. An action agency—in this case, NMFS-Fisheries—does not satisfy its independent *substantive* duty under ESA § 7(a)(2) to insure against jeopardy merely by carrying out its *procedural* duty under that section to consult with the consulting agency, NMFS-Protected Resources. The action agency's reliance on the consulting agency's Biological Opinion must not be arbitrary, capricious, an abuse of discretion, or contrary to law.

23. The regulations require reinitiation of formal consultation in several situations, including "where discretionary Federal involvement or control over the action has been retained or is authorized by law and ... new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

11

**ESA § 9(a)**

24.   The ESA, in Section 9, generally prohibits any person, including both private persons and federal agencies, from "taking" any endangered or threatened species, such as, in this case, leatherback sea turtles or loggerhead sea turtles. 16 U.S.C. § 1538(a)(1). The term "take" is defined by the ESA to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." Id. § 1532(19).

25.   If, following consultation with the action agency, NMFS-Protected Resources concludes that a proposed action will not jeopardize any listed species, it may authorize the take of listed species incidental to the proposed action. In such case, NMFS-Protected Resources must provide in the Biological Opinion an Incidental Take Statement that specifies, among other things, the amount or extent of take that will incidentally occur as a result of the action, and "those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact." 50 C.F.R. § 402.14(i)(1)(i),(ii); see also 16 U.S.C. § 1536(b)(4).

26.   The regulations require that, "if during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded the Federal agency must reinitiate consultation immediately." Id. § 402.14(i)(4).

12

### The National Environmental Policy Act

27.   NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA emphasizes the importance of comprehensive environmental analysis to ensure that federal agencies carefully examine the environmental consequences of their actions before they take such actions. The statute also ensures that the public is made aware of the environmental effects of agencies' decisions, and is allowed to participate in the process of preparing environmental reviews.

28.   To help ensure that agencies make informed decisions, NEPA requires that they prepare a detailed environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

29.   An agency may prepare an environmental assessment (EA) to decide whether the environmental impact of a proposed action warrants the preparation of an EIS. 40 C.F.R. § 1508.9. An EA must provide sufficient evidence and analysis to determine whether an EIS or a finding of no significant impact (FONSI) should be prepared. If an agency decides not to prepare an EIS, it must provide a convincing statement why an action's impacts are insignificant. If substantial questions are raised about whether an action may have a significant effect on the environment, an EIS must be prepared. An impact that is both beneficial and adverse may create a significant effect "even if the

Federal agency believes that on balance the effect will be beneficial." Id. § 1508.27(b)(1).

30.   If the proposed action's effects are likely to be highly controversial, or are highly uncertain or involve unique or unknown risks, or may be cumulatively significant, or may adversely affect endangered species, NEPA regulations provide that the action's effects should be considered significant and an EIS should be prepared.  Id. § 1508.27(b)(4), (5), (7), (9).

**The Migratory Bird Treaty Act**

31.   The MBTA is one of the oldest conservation statutes in existence. Congress passed the MBTA on July 3, 1918, to implement and make enforceable by the courts the International Convention for the Protection of Migratory Birds, 39 Stat. 1702 (1916), between the United States and Great Britain (acting for Canada).  These governments were "desirous of saving from indiscriminate slaughter and of insuring the preservation of such migratory birds as are either useful to man or are harmless."  Convention, August 16, 1916, U.S.-Gr. Brit., 39 Stat. 1702, 1702.

32.   The MBTA and the Convention it implemented were considered "conservation measures of prime importance."  H.R. Rep. No. 65-243 at 3 (reprinted letter from Robert Lansing, Secretary of State, to President Wilson). Justice Holmes called the preservation of migratory birds a "national interest of

very nearly the first magnitude." Missouri v. Holland, 252 U.S. 416, 435 (1920).

33. The United States subsequently executed treaties with Mexico, Japan, and the former Union of Soviet Socialist Republics, the protections of which are now incorporated into the MBTA. 16 U.S.C. § 703.

34. "The fundamental prohibition in the Migratory Bird Treaty Act is couched in … expansive" language. Andrus v. Allard, 444 U.S. 51, 59 (1979). Section 2 of the MBTA provides that "it shall be unlawful at any time, by any means or in any manner," to, among many other prohibited actions, "pursue, hunt, take, capture, [or] kill" any migratory bird included in the terms of the treaties. 16 U.S.C. § 703. The term "take" is defined as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12 (1997). Both the Laysan and Black-footed albatross are included in the list of migratory birds protected by the MBTA.

35. The MBTA imposes strict liability for harming migratory birds.

36. Section 3 of the MBTA authorizes the Secretary of the Interior to "determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, take, capture, [or] killing . . . of any such bird." 16 U.S.C. § 704. FWS may issue a permit allowing the take of migratory birds, but only if the proposed take is consistent with the treaties, statute, and regulations.

## FACTUAL BACKGROUND

### The Swordfish Longline Fishery

37.  In longline fishing, a monofilament mainline is set horizontally at a preferred depth in the water column, suspended by floats spaced at regular intervals.  Mainlines may be up to 60 nautical miles long.  Branchlines are clipped to the mainline at regular intervals, and each branchline carries a single baited hook.   After the mainline is completely deployed, the gear is allowed to "soak" for several hours before being retrieved, or "hauled."  In longlining, a "set" is a discrete unbroken section of mainline, floats and branchlines.

38.  Vessels in the Hawaiʻi-based longline fishery target primarily tuna or swordfish, and use different techniques for each.  Longline fishing for swordfish is known as "shallow-set" fishing; the bait is set at depths of 30–90 meters.  A typical set for swordfish uses about 700–1,000 hooks.  Shallow-set longline gear is set at night, with luminescent light sticks attached to the branchlines.

39.  The Court in Leatherback Sea Turtle v. National Marine Fisheries Service, Civ. No. 99-00152 DAE, 1999 WL 33594329 (D. Haw. October 18, 1999), determined that NMFS had violated NEPA by failing to prepare an EIS assessing the impacts of the Hawaiʻi longline fishery's activities.  The Court enjoined most swordfish longlining pending NEPA compliance.

16

40. In March 30, 2001, NMFS-Protected Resources issued an EIS and a Biological Opinion pursuant to Section 7(a)(2) of the ESA, in which NMFS-Protected Resources concluded that the longline fishery, as NMFS-Fisheries previously had authorized it, was jeopardizing the continued survival of several species of sea turtles. To reduce this impact, NMFS prohibited all Hawai'i-based swordfish longlining beginning in 2002.

41. On April 2, 2004, NMFS-Fisheries promulgated a rule that, among other actions, reopened the Fishery subject to restrictions intended to limit mortality of protected species. In particular, NMFS-Fisheries limited the Fishery to 2,120 sets per year, and required that it use modified fishing gear (e.g., a "circle hook" rather than a "J hook," and mackerel bait instead of squid bait). NMFS-Fisheries also imposed a "hard cap" on turtle bycatch, requiring that if the Fishery caught 16 leatherbacks or 17 loggerheads in a given fishing season, the Fishery would have to close for the remainder of the calendar year.

42. In 2006, the Fishery caught at least 17 loggerheads after only a few months of fishing, and the Fishery closed until the following year. On November 25, 2011, NMFS announced the closure of the Fishery until the end of the calendar year after the Fishery reached its incidental take limit for leatherback turtles of 16.

17

**Sea Turtles**

43.  Sea turtles are among the most ancient creatures living on earth. They were common 130 million years, during the age of dinosaurs in the Cretaceous period.  Six of the world's seven species of sea turtles are now in danger of extinction due to a number of causes, with incidental bycatch in commercial fisheries being among the most significant.

44.  Leatherback sea turtles (*Dermochelys coriacea*) are caught in the Hawai'i longline fishery and are unique among sea turtles in lacking a hard shell.  They are the largest of all sea turtles, and the most massive of all living reptiles: they may grow to a length of 7 feet and weigh up to 2,000 pounds. Living in the open ocean and feeding primarily on jellyfish, leatherbacks can swim at speeds in excess of 20 miles per hour and dive deeper than 3,000 feet.

45.  Leatherback populations in the Pacific include Eastern Pacific populations nesting in Mexico and Costa Rica, and Western Pacific populations nesting primarily in Papua New Guinea, Papua, Indonesia, and the Solomon Islands.  According to defendant NMFS, "past and present fisheries interactions have been, and continue to be, the greatest human impact on leatherback turtles" within the Western Central Pacific area affected by the Fishery.  NMFS, Biological Opinion on Amendment 18 to Fishery Management Plan for Pelagic Fisheries of the Western Pacific Region (2008) at 43.

18

46.  "Catastrophic declines" have been observed in both Eastern and Western Pacific leatherback populations.  NMFS, Leatherback Sea Turtle (*Dermochelys coriacea*) 5-Year Review: Summary and Evaluation (2007) ("Leatherback Status Review") at 26.  The "major nesting rookery at Rantau Bang in Terengganu, Malaysia has collapsed from over 10,000 nests in 1956 to 20 or fewer nests in recent years."  Id. at 14.  "At Playa Grande, Costa Rica, considered the most important nesting beach in the Eastern Pacific, the number of nesting females dropped steadily from 1,367 in 1988-1989 (July-June) to 506 in 1994-1995 to 117 in 1998-1999."  Id. at 12.  In Pacific Mexico, "[t]ens of thousands of nests were likely laid on the beaches in the 1980s, but during the 2003-2004 season a total of 120 nests was recorded on the four primary index beaches combined."  Id. at 13.

47.  The largest known nesting site for the Western Pacific population, accounting for about 38 percent of the population, is at Jamursba-Medi, in Papua, Indonesia.  Nesting numbers at Jamursba-Medi have dropped from over 13,000 nests recorded in 1984 to 1,865-3,601 recorded between 2001 and 2004, which equates to four nesting seasons.  Leatherback Status Review at 13.  More recently, the number of nests for the population has continued to drop, from 6,373 nests in 1996 to a low of 1,537 nests in 2010.  The Western Pacific Regional Fishery Management Council's (WESPAC's) Supplemental EIS (SEIS) for Amendment 18 describes the status of the second largest Western

Pacific leatherback population, in Papua New Guinea, as "critical." SEIS at 86, 88.

48.  The leatherback sea turtle has been listed since 1970 under the Endangered Species Act as "endangered" throughout its entire range.

49.  The International Union for Conservation of Nature and Natural Resources' ("IUCN's") Red List is one conservation tool upon which scientists rely, and is the world's most comprehensive inventory of the global conservation status of plant and animal species. The IUCN's Red List 2000 classifies the leatherback as "Critically Endangered" at a global level, facing an "extremely high risk of extinction in the wild," because there has been an "observed, estimated, inferred or suspected reduction of at least 80% over the last three generations." In fact, the IUCN concluded the leatherback's global population may have been reduced by 78 percent in less than a single generation.

50.  The Fishery also catches and kills loggerhead sea turtles (*Caretta caretta*). According to defendant NMFS, "[t]he most significant manmade factor affecting the survival and recovery of the loggerhead is incidental capture in commercial and artisinal fisheries." NMFS, Loggerhead Sea Turtle (*Caretta caretta*) 5-Year Review: Summary and Evaluation (2007) at 36.

51.  According to defendant NMFS, all of the loggerheads the Fishery incidentally catches come from the North Pacific population that nests in Japan, and that population has declined by 50-90 percent over the past fifty years.

52.  In 1978, the loggerhead sea turtle was listed under the Endangered Species Act as "threatened" throughout its range.  In July 2007, plaintiffs TIRN and the Center submitted to NMFS a petition to uplist the North Pacific loggerhead population to "endangered."  In August 2009, defendant NMFS issued a Loggerhead Sea Turtle 2009 Status Review, in which NMFS found that the North Pacific population of loggerheads qualifies as a distinct population segment ("DPS") as defined in the Endangered Species Act, and that the population faces a "high likelihood of quasi-extinction."  Id. at vi; see also id. at 161 (population "at risk of extinction.")

53.  On September 22, 2011, NMFS reclassified the North Pacific loggerhead population's status as "endangered" under the ESA.  76 Fed. Reg. 58,868 (September 22, 2011).

**Amendment 18**

54.  On or about March 10, 2009, WESPAC issued a Final Supplemental Environmental Impact Statement purporting to assess the environmental impacts of Amendment 18 to the Fishery Management Plan which governs the Fishery's operation.  Amendment 18 removes all limits on the number of sets the Fishery is allowed to fish.

55. On December 10, 2009, NMFS published a final rule implementing Amendment 18, which became effective as of January 11, 2010.

56. According to defendant NMFS, prior to NMFS's removal of all limits on swordfish longline effort in the Fishery, North Pacific loggerheads faced an over 83 percent likelihood of becoming quasi-extinct within the next three loggerhead generations. Amendment 18 nevertheless nearly tripled the number of loggerhead sea turtles the Fishery was authorized to catch.

57. According to defendant NMFS, at the time it approved Amendment 18, baseline conditions for the Western Pacific leatherback population were already poor, and appeared to be getting worse. Amendment 18 nevertheless eliminated any restrictions on swordfish fishing effort, maximizing the likelihood that leatherback turtles would be entangled and drowned during the fishing season, since the Fishery would be open until the maximum number of leatherbacks or loggerheads was caught.

58. Plaintiffs challenged NMFS's issuance of Amendment 18 as violating environmental laws and the MSA in Turtle Island Restoration Network, et al. v. Department of Commerce, et al., Civ. No. 09-00598 DAE (D. Haw. Dec. 16, 2009). The parties entered into a Stipulated Injunction vacating those portions of the Biological Opinion that NMFS-Protected Resources had prepared for Amendment 18 in 2008, and those portions of the accompanying Incidental Take Statement, that related to loggerhead and leatherback turtles,

along with the regulations implementing the incidental take provisions of Amendment 18 for the turtle species. Pursuant to the Stipulated Injunction, the levels of incidental take for loggerheads and leatherbacks previously in force (17 and 16 each year, respectively) were reinstated until NMFS issued a new Biological Opinion and new regulations implementing incidental take levels supported by new analyses. See Turtle Island Restoration Network v. U.S. Dept. of Commerce, 834 F. Supp. 2d 1004, 1023-24 (D. Haw. 2011).

59. On January 30, 2012, only three months after uplisting the North Pacific population of the loggerhead sea turtle to endangered status, NMFS-Protected Resources issued a new Biological Opinion and accompanying Incidental Take Statement for Amendment 18. The 2012 ITS authorized doubling incidental take of endangered loggerhead sea turtles in the Fishery from 17 to 34. The 2012 ITS also authorized an increase in the annual hard cap on incidental take of endangered leatherback sea turtles from 16 to 26.

60. On October 4, 2012, NMFS issued the Final Rule, implementing the increased take levels for the leatherback and loggerhead sea turtles in the Fishery, effective November 5, 2012.

**Migratory Seabirds**

61. When longlines are being set or hauled, and the baited hooks are near the water's surface, birds dive at the bait, become hooked, and drown. As a result, mortality in longline fisheries has become the most critical global

23

threat to albatross species. Nineteen of the world's 21 albatross species are now globally threatened with extinction, due principally to incidental catch in longline fisheries.

62. The Fishery catches and drowns migratory seabirds. Most of the birds caught in the Fishery are Black-footed albatross (*Phoebastria nigripes*) and Laysan albatross (*Phoebastria immutabilis*). The Black-footed albatross nests almost entirely in the Northwestern Hawaiian Islands. The short-tailed albatross (*Phoebastria albatrus*), numbering only about 2,300 breeding pairs globally and listed as endangered under the Endangered Species Act, also has been spotted in areas where the Fishery operates.

63. The death of even one Black-footed albatross has an exponential impact on the breeding success of the entire species. The birds mate for life and return to the same nest site each year to reunite with their mates. If one mate fails to return to the nest, the remaining mate likely will miss three breeding cycles before it finds a new life-partner and mates.

64. The IUCN classifies the Black-footed albatross as Vulnerable because it faces "a high risk of extinction in the wild," and "is expected to decline rapidly over a period of three generations (2009-2065) owing primarily to mortality caused by longline fishing fleets." The IUCN proposes that best-practice mitigation measures in longline fisheries within the species' range be adopted to conserve the species.

24

**The Permit Authorizing Incidental Take of Migratory Seabirds**

65.  NMFS-Fisheries adopted a regulation requiring that longline vessels utilize mitigation methods designed to reduce seabird bycatch.  The regulation requires in relevant part that Fishery vessels must employ one of two methods for mitigating seabird bycatch: "side-setting," or, alternatively, discharging fish parts (offal) on the opposite side of the vessel while setting or hauling longline gear, using thawed bait that has been dyed blue, and setting and hauling the lines at night.  50 C.F.R. § 665.35.

66.  Side-setting is a means by which longline gear is deployed from the side of the vessel rather than from the conventional position at the stern. When set from the side, the baited hooks travel along the side of the vessel hull where seabirds, such as albatrosses, are unable or unwilling to pursue them.  Ideally, by the time the hook passes the stern, the hook has sunk below the surface, beyond the reach of seabirds.

67.  Research has shown that seabird bycatch varies with the mitigation method employed, geographic location, time of day when lines are set, and other variables.  According to NMFS, "sea trials indicate that side-setting is the most effective of any single seabird mitigation method in reducing albatross mortality in the Hawaii longline fishery.  Side-setting produced the lowest seabird interaction rates when compared to underwater setting chutes and blue-dyed bait in both [tuna] and [swordfish] fisheries."  NMFS, Annual Report on

<u>Seabird Interactions and Mitigation Efforts in the Hawaii Longline Fishery for 2007</u> (2008).

68. According to WESPAC's March 10, 2009 final SEIS for Amendment 18, "[s]ide-setting has been proven to nearly eliminate seabird interactions with longline vessels." SEIS at 250.

69. Despite this, vessels in the Fishery are not required to employ side-setting, and less than 7 percent of vessels in the Fishery were actually utilizing side-setting as of 2010. NMFS, <u>Annual Report on Seabird Interactions and Mitigation Efforts in the Hawaii Longline Fisheries – 2010</u> (September 2011). The Fishery continues to hook and drown seabirds, including Black-footed and Laysan albatross.

70. On August 24, 2012, defendant FWS issued a 3-year Special Purpose Permit that authorizes the shallow-set fishery to take 191 Black-footed albatrosses, 430 Laysan albatrosses, 30 northern fulmars, 30 sooty shearwaters, and one short-tailed albatross. FWS issued the Permit under the purported authority of 50 C.F.R. § 21.27. As FWS acknowledges, this is the first time FWS has applied the Special Purpose permitting regulations to authorize incidental take of migratory birds by an agency regulating a commercial, non-conservation activity.

71. The Permit authorizes the status quo in the Fishery with respect to bycatch of migratory birds. The Permit does not comport with the MBTA's

conservation intent and mandate, confers no benefit to individual migratory birds or the bird populations as a whole, does not promote any important research, and is not supported by any compelling conservation justification.

72. The Permit does not limit the number of protected migratory birds the Fishery may take, nor does it require that any research be performed that is novel or important to the conservation of the affected species.

73. The Permit does not require the Fishery to use side-setting, the bycatch avoidance method FWS itself acknowledged is the most effective. Moreover, in the Environmental Assessment it prepared for the Permit, FWS failed even to consider requiring side-setting as an alternative to the status quo.

**FIRST CLAIM FOR RELIEF**
(VIOLATION OF MIGRATORY BIRD TREATY ACT AND
ADMINISTRATIVE PROCEDURE ACT)
(AGAINST U.S. DEPARTMENT OF THE INTERIOR,
U.S. FISH & WILDLIFE SERVICE, AND KEN SALAZAR)

74.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

75.   FWS's issuance of the Permit was arbitrary, capricious and contrary to law, including the MBTA, and invalid, for reasons including but not limited to those alleged hereinafter.

76.   The MBTA makes it "unlawful at any time, by any means or in any manner," to, among many other prohibited actions, "pursue, hunt, take, capture, [or] kill" any migratory bird, including the Black-footed albatross and Laysan albatross, 16 U.S.C. § 703, except as authorized by a permit issued by FWS that complies with the MBTA's strict conservation intent and the terms of a regulation authorizing such take.

77.   FWS issued the Permit under the purported authority of 50 C.F.R. § 21.27, which requires that an applicant "make[] a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification."

78.   The Permit does not comport with the MBTA's conservation intent and mandate, confers no benefit to individual migratory birds or the bird

28

populations as a whole, does not promote any important research, and is not supported by any compelling justification.

## SECOND CLAIM FOR RELIEF
(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURE ACT)
(AGAINST U.S. DEPARTMENT OF THE INTERIOR,
U.S. FISH & WILDLIFE SERVICE, AND KEN SALAZAR)

79. Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

80. NEPA requires that an Environmental Assessment analyze a reasonable range of alternatives to a proposed action. Despite having been urged to do so by plaintiffs, FWS failed and refused to analyze as an alternative to the status quo requiring the Fishery to mandate the use of side-setting, the bycatch avoidance method FWS itself has identified as the most effective. This failure was arbitrary, capricious, and contrary to law.

## THIRD CLAIM FOR RELIEF
(VIOLATION OF ENDANGERED SPECIES ACT SECTION 7 AND ADMINISTRATIVE PROCEDURE ACT)
(AGAINST U.S. DEPARTMENT OF COMMERCE, NATIONAL MARINE FISHERIES SERVICE, AND REBECCA BLANK)

81. Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

82. The 2012 Biological Opinion defendant NMFS prepared to assess the Final Rule's impacts upon threatened and endangered species is arbitrary,

capricious, contrary to law, and invalid, for reasons including but not limited to those alleged hereinafter.

83. The 2012 BiOp is arbitrary, capricious, and contrary to law in failing to minimize take, in violation of 16 U.S.C. § 1536(b)(4) and 50 C.F.R. § 402.14(i).

84. The 2012 BiOp is arbitrary, capricious, and contrary to law in that it is not based upon the best scientific and commercial data available. NMFS entirely ignored relevant factors and failed to analyze and develop projections based on information and methodology that was available, in violation of 16 U.S.C. § 1536(a)(2).

85. The 2012 BiOp is arbitrary, capricious, and contrary to law in that NMFS-Protected Resources' jeopardy analysis fails to determine whether the action, in combination with the environmental baseline and cumulative effects, will jeopardize the species, in violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.02 (definition of "jeopardize the continued existence of").

86. The 2012 BiOp is arbitrary, capricious, and contrary to law in that it eliminates the requirement that all vessels in the Fishery carry an observer, making timely compliance with the mandatory closure of the Fishery upon reaching a hard cap on sea turtle take impracticable.

87. The 2012 BiOp is arbitrary, capricious, and contrary to law in that it fails to integrate the impacts of global climate change into its analysis of whether the Final Rule will jeopardize endangered sea turtles.

88. The 2012 BiOp is arbitrary, capricious, and contrary to law in that it limited the temporal scope of its jeopardy analysis to only the next 25 years, even though the increase in fishing effort authorized by Amendment 18 will continue indefinitely.

## FOURTH CLAIM FOR RELIEF
### (VIOLATION OF ENDANGERED SPECIES ACT SECTION 7 AND ADMINISTRATIVE PROCEDURE ACT)
### (AGAINST U.S. DEPARTMENT OF COMMERCE, NATIONAL MARINE FISHERIES SERVICE, AND REBECCA BLANK)

89. Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

90. Section 7(a)(2) of the ESA requires NMFS-Fisheries, as the action agency implementing the Final Rule, to insure that its actions are not likely to jeopardize the continued existence of any threatened or endangered species.

91. NMFS- Fisheries' reliance on NMFS-Protected Resources' inadequate 2012 Biological Opinion was arbitrary, capricious, an abuse of discretion and/or contrary to law, and violates the former's duties under 16 U.S.C. § 1536(a)(2) to insure against jeopardy, and to reinitiate consultation when new information reveals effects of the action that may affect listed species in a manner or to an extent not previously considered.

31

**FIFTH CLAIM FOR RELIEF**
(VIOLATION OF ENDANGERED SPECIES ACT SECTION 9)
(AGAINST U.S. DEPARTMENT OF COMMERCE, NATIONAL MARINE
FISHERIES SERVICE, AND REBECCA BLANK)

92.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

93.   The Final Rule authorizes fishing that presents an imminent and reasonably certain threat of harm to endangered leatherback and loggerhead sea turtles.  The 2012 BiOp upon which the2012  Incidental Take Statement purporting to authorize take of these species is based is inadequate and invalid, and defendants' take of the species therefore is unauthorized and violates 16 U.S.C. § 1538(a).

**SIXTH CLAIM FOR RELIEF**
(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT AND
ADMINISTRATIVE PROCEDURE ACT)
(AGAINST U.S. DEPARTMENT OF COMMERCE, NATIONAL MARINE
FISHERIES SERVICE, AND REBECCA BLANK)

94.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

95.   The March 10, 2009 SEIS addressing the impacts of Amendment 18, while mentioning the proposal at that time to take up to 19 leatherback sea turtles, makes no mention whatsoever of the proposal, adopted and authorized by the 2012 BiOp and the Final Rule, to allow the Fishery to take up to 26 leatherbacks.  NMFS prepared no NEPA document discussing such effects.

96. NMFS's failure to assess the effects of the Final Rule on leatherback sea turtles in a NEPA document was arbitrary, capricious, and contrary to law in violation of NEPA and the APA.

**SEVENTH CLAIM FOR RELIEF**
(VIOLATION OF MAGNUSON-STEVENS FISHERY
CONSERVATION AND MANAGEMENT ACT)
(AGAINST U.S. DEPARTMENT OF COMMERCE, NATIONAL
MARINE FISHERIES SERVICE, AND REBECCA BLANK)

97. Plaintiffs re-allege, as if fully set forth herein, each and every allegation set forth in this Complaint.

98. For each of the reasons set forth above, and in each of the above outlined six claims, the Final Rule and its implementing regulations are not consistent with applicable law. The decision to finalize and promulgate the Final Rule and its accompanying regulations in spite of the measures' inconsistencies with applicable law is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the MSA, 16 U.S.C. § 1855(f), and violates the MSA, 16 U.S.C. §§ 1853(a)(1), 1854(a)(1).

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1. Enter a declaratory judgment that U.S. Department of the Interior, U.S. Fish and Wildlife Service, and Ken Salazar have violated and are violating the

33

Migratory Bird Treaty Act and the Administrative Procedure Act by issuing the Permit;

2.      Enter a declaratory judgment that U.S. Department of the Interior, U.S. Fish and Wildlife Service, and Ken Salazar have violated and are violating the National Environmental Policy Act and the Administrative Procedure Act by issuing the Permit;

3.      Enter a declaratory judgment that U.S. Department of Commerce, National Marine Fisheries Service, and Rebecca Blank have violated and are violating Section 7 of the Endangered Species Act and Administrative Procedure Act by issuing an inadequate Biological Opinion purporting to analyze the Final Rule's impacts on threatened and endangered species;

4.      Enter a declaratory judgment that U.S. Department of Commerce, NMFS, and Rebecca Blank have violated and are violating Section 7 of the Endangered Species Act by failing to insure against jeopardy to threatened and endangered species and by failing to reinitiate consultation;

5.      Enter a declaratory judgment that U.S. Department of Commerce, NMFS, and Rebecca Blank have violated and are violating Section 9 of the Endangered Species Act by issuing the Final Rule authorizing the Fishery to fish in a manner that likely will take threatened and endangered sea turtles without legal authorization;

6.      Enter a declaratory judgment that U.S. Department of Commerce, NMFS, and Rebecca Blank have violated and are violating the National Environmental Policy Act and Administrative Procedure Act by issuing the Final Rule without complying with NEPA;

7.      Enter a declaratory judgment that U.S. Department of Commerce, NMFS, and Rebecca Blank have violated and are violating the Magnuson-Stevens Fishery Conservation and Recovery Act and Administrative Procedure Act by issuing the Final Rule;

8.      Vacate the Final Rule;

9.      Vacate the Permit;

10.     Issue appropriate injunctive relief;

11.     Award plaintiffs the costs of this litigation, including a reasonable attorney's fee; and

12.     Provide such other relief as may be just and proper.

DATED:     Honolulu, Hawai'i, November 2, 2012.

Respectfully submitted,

_____
PAUL H. ACHITOFF
Earthjustice
223 S. King Street, Suite 400
Honolulu, HI 96813
Attorney for Plaintiffs