IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TURTLE ISLAND RESTORATION NETWORK; and CENTER FOR BIOLOGICAL DIVERSITY, ) ) ) | CIVIL NO. 12-00594 SOM-RLP |
| ) | ORDER AFFIRMING THE AGENCIES' |
| Plaintiffs, ) ) | DECISIONS |
| ) | |
| vs. ) ) ) | |
| UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE FISHERIES SERVICE; PENNY PRITZKER, in her official capacity as Acting Secretary of Commerce; UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; and S.M.R. JEWELL, in her official capacity as Secretary of the Interior, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants ) ) | |
| and ) ) | |
| HAWAII LONGLINE ASSOCIATION, ) ) | |
| Intervenor-Defendant. ) ) ) | |
| _____ ) | |

**ORDER AFFIRMING THE AGENCIES' DECISIONS**

**I.      INTRODUCTION.**

Plaintiffs Turtle Island Restoration Network and Center

for Biological Diversity challenge federal agency decisions

allowing shallow-set longline fishing for swordfish.  Plaintiffs

argue that Defendant U.S. Fish and Wildlife Service ("FWS")

violated the Migratory Bird Treaty Act ("MBTA") and the National

Environmental Policy Act ("NEPA"), and that the National Marine Fisheries Service ("NMFS") violated the Endangered Species Act ("ESA") and NEPA.  Relying on the the alleged violations of the MBTA, NEPA, and the ESA, Plaintiffs also assert violations of the Administrative Procedures Act ("APA") and the Magnuson-Stevens Fishery Conservation and Management Act.

Hawaii Longline Association has intervened in this matter to defend the interests of the longline swordfish fishery.

Plaintiffs present an inherently sympathetic case in seeking to protect birds and turtles.  Nevertheless, because Plaintiffs do not establish that any agency decision at issue here was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," see 5 U.S.C. § 706(2)(A), the court affirms the agencies' decisions.

II.     **BACKGROUND.**

On or about August 10, 2011, pursuant to 50 C.F.R. § 21.27, NMFS submitted an application to FWS for a special purpose permit for a Hawaii-based shallow-set longline fishery. See Federal Fish and Wildlife Permit Application Form, N009715.[1]

_____

[1]The Administrative Record on this appeal is voluminous and made particularly difficult to refer to by the use of three numbering systems.  Bates-stamped documents preceded with the letter "N" appear to relate to the NMFS's decision(s) in this matter.  Bates-stamped documents preceded with the letter "F" appear to relate to FWS's decision(s) in this matter.  Bates-stamped documents that are not preceded by a letter appear to concern Amendment 18 to the Fishery Ecosystem Plan for Pelagic Fisheries for the Western Pacific Region.  For ease of reference,

NMFS is the division of the National Oceanic and Atmospheric Administration that is responsible for managing, conserving, and protecting marine life in waters adjacent to this country's coasts.

NMFS's permit application sought permission to incidently "take" migratory seabirds in connection with shallow-set longline fishing for swordfish.  On July 27, 2012, FWS published a Final Environmental Assessment ("Final EA") evaluating that application.  See Final EA, F000304, ECF No. 43-1, PageID # 1688.

According to the Final EA, the fishing at issue involves the setting of thousands of baited hooks along "tens of miles of line set in the water column."  Id. at F00309, ECF No. 43-1, PageID # 1693.  The hooks are suspended between floats, deployed after sunset, and retrieved before sunrise the next morning.  Id.  Seabirds attracted to the fishing vessels may try to eat the bait on the hooks as the hooks are being deployed or hauled in, or to eat the fish offal or bait discarded near the fishing vessels.  The birds can become hooked or tangled in the fishing gear and injured or killed as a result.  Id.  If, for example, a seabird swallows a baited hook as it is being deployed, the seabird may be dragged underwater and die.  Id.

---

the court also refers to these documents, whenever possible, by their ECF numbers.

Seabird-handling guidelines tell fishing vessels what to do when seabirds that have been hooked or entangled are retrieved alive. See N009751-53.  Other sea life, including sea turtles, may also be injured or killed when hooked or entangled in the longline fishing gear.  Id.

The Final EA said that the shallow-set longline fishery at issue in this case was closed by court order in 2001 in response to litigation over the "taking" of threatened and endangered sea turtles.  See Administrative Record at F000310, ECF No. 43-1, PageID # 1694.  After an Environmental Impact Statement ("EIS") was prepared, the fishery was reopened in late 2004, under regulations designed to reduce the number and severity of "interactions" between the turtles and the fishing gear.  Id.  These regulations included gear and bait requirements and an annual cap of 2,120 on the number of shallow-set lines in the fishery.  Id.  The regulations included a cap on permitted "interactions" with sea turtles, which, if reached, would require closure of the fishery for the remainder of the year to which the cap applied.  Id.  Additionally, NMFS placed observers on all vessels in the fishery.  See Biological Opinion (Turtles) of Jan. 30, 2012, at N000018, ECF No. 42-3, PageID # 1204 (not to be confused with the separate Biological Opinion of Jan. 6, 2012, relating to seabirds, F001861, ECF No. 43-2, PageID # 1775).  The implementation of these regulations caused a drop of

4

approximately 97 and 90 percent in fishery interactions with loggerhead and leatherback sea turtles, respectively.  See id at N000063-65, PageID #s 1249-51.  The rules for the fishery required the lines to be "set" one hour after sunset.  The rules also provided an option to use "side-setting," as opposed to deploying lines from the stern of the vessel, to further reduce seabird interactions.  See Final EA, Administrative Record at F000310, ECF No. 43-1, PageID # 1694.  The rate of seabirds "taken" after the reopening of the fishery in 2004 also declined from the rate before the fishery closed in 2001.  Id.

The 2,120 limit on the number of shallow-set lines per year, although not reached, was removed in 2010.  See id. at F000310, ECF No. 43-1, PageID # 1694.  The regulations lifting that limit "codified" Amendment 18 to the Fishery Management Plan for Pelagic Fisheries of the Western Pacific Region, a copy of which is attached to the Administrative Record beginning at page 000865, ECF No. 43-4, PageID # 1929.  The Biological Opinion (Turtles) detailing the conclusions of NMFS, Pacific Island Region, with respect to Northern Pacific loggerhead and leatherback sea turtles (both endangered species) concluded that lifting the limit was not reasonably expected to cause an appreciable reduction in the likelihood of the survival of either species.  See ESA -- Section 7 Consultation, Biological Opinion

of NMFS, Pacific Islands Region dated Jan. 20, 2012,

Administrative Record at 119-25, ECF No. 48-5, PageID #s 2673-79.

The Biological Opinion (Turtles) stated that NMFS anticipated the following "incidental takes" in any one-year period: 34 interactions with Northern Pacific loggerhead sea turtles, resulting in 7 deaths; and 25 interactions with leatherback sea turtles, resulting in 6 deaths.  Administrative Record at N000135, ECF No. 48-5, PageID # 2689.  It concluded that "the level of incidental take anticipated from the proposed action is not likely to jeopardize" the loggerhead or leatherback sea turtle species.  Id.

The Biological Opinion (Turtles) listed what it considered to be reasonable and prudent measures necessary to minimize the impact of the incidental "takes" on leatherback and loggerhead sea turtles.  First, NMFS was required to "collect data on the capture, injury, and mortality caused by the shallow-set longline fishery, and [to] collect basic life-history information, as available."  Administrative Record at N000136, ECF No. 48-5, PageID # 2690.  As part of this measure, NMFS was required to maintain observer coverage at rates determined to be statistically reliable, and the observers were to collect information concerning each turtle interaction.  Id.  The observers were required to tag turtles that were safely brought aboard a vessel and to note the condition of each such turtle at

the time of its release.  NMFS was also required to issue
quarterly summaries of the observers' data.  Id. at N000137, ECF
No. 48-5, PageID # 2691.

The second measure listed in the Biological Opinion
(Turtles) as reasonable and prudent was NMFS's requirement that
all sea turtles incidently caught in fishing gear be released in
a manner that minimized injury and the likelihood of further
entanglement or entrapment, taking into account the best
practices for safe vessel operation and fishing operations.  Id.
at N000136, ECF No. 48-5, PageID # 2690.  To that end, NMFS was
required to conduct workshops for vessel owners and operators; to
train observers about sea turtle biology and techniques for
proper handling, dehooking, and resuscitation; to train fishermen
in the removal of hooks; and to ensure that vessels had wire- or
bolt-cutters onboard capable of cutting any hook.  Id. at
N000137-38, ECF No. 48-5, PageID # 2691-92.  NMFS was also
required to have all fishing vessels carry a "dip net" that would
allow the vessel to hoist a turtle onto its deck to remove a
hook, unless a vessel was too small to have such a net, in which
event the vessel was required to have fishermen ease the turtle
onto the deck by grabbing its carapace or flippers.  Vessels were
required to ensure that turtles were not dropped onto the deck.
Id. at N000137, ECF No. 48-5, PageID # 2691.

7

The third measure that the Biological Opinion (Turtles) imposed on NMFS as reasonable and prudent was the requirement that all comatose or lethargic sea turtles be retained on vessels, handled, resuscitated, and released according to certain procedures. Id. at N000136 and -38, ECF No. 48-5, PageID # 2690 and -92.

The fourth measure that the Biological Opinion (Turtles) imposed on NMFS as reasonable and prudent was the requirement that any vessel on which a sea turtle died in connection with longline fishing return the carcass to the sea, unless asked to retain the carcass for research. Id. at N000136 and -38, ECF No. 48-5, PageID # 2690 and -92.

**III.     APA STANDARD.**

Although the court has before it motions for summary judgment, it is really being asked to review agency decisions under the APA. That Act requires this court to review a federal agency's actions, findings, and conclusions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." See 5 U.S.C. § 706(2)(A). Review under the arbitrary and capricious standard must be "narrow," but "searching and careful." Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989). This deferential standard requires this court to consider whether there is a rational connection between the facts found and the choices made

8

by the agency, and whether the agency committed a clear error of judgment.  See W. Watershed Project v. Abbey, 719 F.3d 1035, (9th Cir. 2013); Or. Nat. Res. Council v. Allen, 476 F.3d 1031, 1036 (9th Cir. 2007).  A court should presume the agency's action to be valid and affirm the agency action "if a reasonable basis exists for its decision."  Pac. Coast Fed'n of Fishermen's Ass'n v. Blank, 693 F.3d 1084, 1091 (9th Cir. 2012).

The Supreme Court has explained that an agency's action is "arbitrary and capricious" when

> the agency has relied on factors which
> Congress has not intended it to consider,
> entirely failed to consider an important
> aspect of the problem, offered an explanation
> for its decision that runs counter to the
> evidence before the agency, or is so
> implausible that it could not be ascribed to
> a difference in view or the product of agency
> expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  A court reviewing an agency's actions should not itself attempt to make up for the agency's deficiencies, as it "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'"  Id. (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

Finally, an agency's interpretation of a statute

> is reviewed under the two-step framework of
> Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S.
> 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694
> (1984). We ask first "whether Congress has
> directly spoken to the precise question at
> issue." Id. at 842, 104 S. Ct. 2778.  If it

9

has, we "must give effect to the
unambiguously expressed intent of Congress,"
regardless of the agency's interpretation.
Id. at 842-43, 104 S. Ct. 2778.  If, however,
the statute is "silent or ambiguous" with
regard to the issue, we next ask "whether the
agency's answer is based on a permissible
construction of the statute."  Id. at 843,
104 S. Ct. 2778 (footnote omitted).  We must
defer to the agency's interpretation if it is
reasonable.  Id. at 844, 104 S. Ct. 2778
(holding that when Congress has left a gap
for an agency to fill, "a court may not
substitute its own construction of a
statutory provision for a reasonable
interpretation made by the administrator of
an agency").

Pac. Coast Fed'n, 693 F.3d at 1091.

An agency implementation of a particular statutory
provision, like an agency's interpretation of a statute, may also
qualify for Chevron deference.  Courts defer to an agency's
implementation of a statutory provision "when it appears that
Congress delegated authority to the agency generally to make
rules carrying the force of law, and that the agency
interpretation claiming deference was promulgated in the exercise
of that authority."  United States v. Mead Corp., 533 U.S. 218,
226-27 (2001).  Even when Chevron deference is not appropriate,
an "agency's interpretation may merit some deference whatever its
form, given the specialized experience and broader investigations
and information available to the agency, and given the value of
uniformity in its administrative and judicial understandings of
what a national law requires."  Id. at 234 (quotation marks and

10

citations omitted); but see Price v. Stevedoring Servs. of Am., Inc., 697 F.3d 820, 829-31 (9th Cir. 2012) (en banc) (declining to give Chevron deference to a litigation position interpreting a statute that was advanced by the Director of Office of Workers' Compensation Programs).

When an agency interprets its own regulations, as opposed to interpreting a congressional statute, the agency's construction of its own regulations is "entitled to substantial deference." Martin v. Occupational Safety & Health Review Com'n, 499 U.S. 144, 150 (1991); Lezama-Garcia v. Holder, 666 F.3d 518, 525 (2011). Courts defer to an agency's interpretation of its own regulations when the agency's interpretation is reasonable. See Shalala v. Guernsy Mem. Hosp., 514 U.S. 87, 94-95 (1995). Accord Lal v. I.N.S., 255 F.3d 998, 1004 N.3 (9th Cir. 2001) ("Because this case involves the interpretation by the BIA of its own regulation (and not the language of a statute) we look to the line of cases including Shalala . . . ."). However, a court need not defer to an agency's interpretation of its own regulation when the agency's interpretation conflicts with the regulation's plain language or with the agency's intent at the time the regulation was promulgated. Lal, 255 F.3d at 1004.

IV.        AGENCY POSITIONS.

As a preliminary matter, the court clarifies its treatment of statements by agency officials. Plaintiffs cite numerous pages of the Administrative Record as evidencing the positions of government agencies. However, close examination reveals that many of these citations are not to official agency positions, but are instead to opinions of individual agency employees preliminarily evaluating the longline fishing at issue in this case or discussing what position the agency should adopt. They are, in short, part of the debate internal to an agency as it determines what position to take.

For example, Plaintiffs say that FWS "acknowledged [that] permitting the Fishery, a commercial activity with 'no benefit to migratory birds,' to kill albatross with impunity was 'unique' and 'unprecedented.'" <u>See</u> Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 4, ECF No. 30-1, PageID # 331 (citing Administrative Record at F000007). Plaintiffs' citation to F000007 is a citation to an Information Memo written by Paul Schmidt, FWS Assistant Director for Migratory Birds, who wrote, "This permit, if issued, would be the first time that 50 CFR 21.27 has been implemented to authorize unintentional take for non-conservation action (a commercial operation) that inherently provides no benefit to migratory birds." Administrative Record F000007, ECF No. 43-1, PageID # 1671. Not

12

only does the cited reference not contain the words "unique" and "unprecedented," Plaintiffs fail to show that the Assistant Director for Migratory Birds was authorized to speak on behalf of the agency at the time the Information Memo was written, not just to argue a position to those authorized to decide the agency's position.  See Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers, 384 F.3d 1163, 1174-75 (9th Cir. 2004) (noting that e-mail correspondence indicating that it was a draft and part of "brainstorm[ing]" was not sufficient to demonstrate arbitrary or capricious conduct, as it "was preliminary and not the official view of any agency").

Plaintiffs cite Administrative Record at N009643 for the proposition that FWS "emphasized that concerns about MBTA compliance-based economic impacts to the Fishery '*do not constitute a compelling justification* for permit issuance . . . .'"  See Plaintiffs' Memorandum in Support of Motion at 6, ECF No. 30-1, PageID # 333.  However, that citation is not to an official FWS position, but instead to an e-mail from Holly Freifeld, who works for the FWS Division of Migratory Birds and Habitat Programs, Pacific Region.  See Administrative Record at N009643, ECF No. 35-1, PageID # 491.  Calling the MBTA permit application "unique," Freifeld stated, "The economic considerations and scenario of increased or unmonitored take in foreign-flag fisheries alone do not constitute a compelling

13

justification for permit issuance." Id.  Nothing in the record indicates that Freifeld was authorized to speak for FWS on the matter at the time or that her statement was anything but a description of a position she was urging the the agency to take or of views expressed at a meeting by other individuals.

Similarly, Plaintiffs' citation of Administrative Record F000043, ECF No. 31-2, PageID # 385, on page 10 of their Memorandum in Support of Motion for the proposition that the NMFS "refused to commit to *any* action to reduce bird take, and offered no compelling justification" is unpersuasive.  That citation is to a comment made in response to a draft environmental assessment.  It is not clear who made the comment, and the comment itself notes that it is the commenter's own thought on the matter.  Although the comment states, "The problem, of course, is that NMFS still hasn't supplied a particularly 'compelling' justification, despite our detailed guidance and suggestions about this," it is not at all clear why it should be deemed to represent NMFS's official position.

Plaintiffs' overstatements are not limited to agency statements regarding birds.  On page 24 of their memorandum in support of their motion, they cite Administrative Record at N000727 for the proposition that NMFS knew that causing an 11 percent decline in the turtle population was "potentially problematic."  That citation is to a page of a powerpoint

14

presentation that was apparently used in a "briefing."   See
Administrative Record at N000719.   Nothing in the powerpoint
presentation indicates that it represents the final agency
position on the issue, as opposed to the advocacy of a particular
preliminary position.   Moreover, as discussed in more detail
below, the reference to an 11 percent reduction in the turtle
population is itself problematic.

At the hearing on the present motions, Plaintiffs said
that they had not intended their citations to various comments to
represent official agency positions and that the citations only
provided context and illustrated how controversial the agency
positions were.   But the propositions in Plaintiffs' briefs go
well beyond providing context and clearly suggest that, in
issuing the permit in issue, the agencies were defying their own
principles.   The court sees no reason to attribute to any agency
every comment made by agency employees during preliminary and
internal discussions preceding the agency's articulation of its
position.   To do so would deter the kind of robust discussion
necessary for an informed decision.

**V.       Seabirds.**

**A.   Migratory Bird Treaty Act.**

Plaintiffs' First Claim for Relief asserts a violation
of the MBTA, which makes it "unlawful at any time, by any means
or in any manner, to pursue, hunt, take, capture, [or] kill" any

migratory bird or attempt to do so, unless permitted by regulations.  See 16 U.S.C. § 703(a).  In relevant part, the purpose of the MBTA is to "aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct."  16 U.S.C. § 701.  Any violation of § 703(a) is a misdemeanor and subjects the violator to a fine of up to $15,000 and imprisonment of up to six months. 28 U.S.C. § 707(a).

The MBTA requires the Secretary of the Interior to "make and publish all needful rules and regulations for carrying out the purposes of" the MBTA.  16 U.S.C. § 701.  To that end, the regulations implementing the MBTA allow FWS to issue permits for the "taking" of migratory birds.  In relevant part, the regulations allow permits to be issued "for special purpose activities related to migratory birds . . . which are otherwise outside the scope of the standard form permits . . . ."  50 C.F.R. § 21.27.  Such a permit may be issued upon "a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification."  Id.  There is no dispute that section 21.27 was promulgated through the proper rulemaking process.  See, e.g., 39 F.R. 1158 (Jan. 4, 1974).

FWS evaluated the permit application in its Final EA of July 27, 2012.  According to that Final EA, the "taking" of any

16

migratory seabird violates the MBTA, unless the "take" is authorized. See Administrative Record at F000311, ECF No. 43-1, PageID # 1695. The Final EA evaluating the permit request to "take" migratory seabirds in connection with the shallow-set longline fishery notes that some incidental "take" cannot practically be avoided and is not the intent of the fishing. Id.

The permit application sought authority to "take" certain migratory birds incidental to the fishing operation. The migratory birds included the Black-footed albatross, the Laysan albatross, the Short-tailed albatross, the Sooty shearwater, and the Northern fulmar. See Administrative Record at N009737-41. Each of these birds is listed as a migratory bird in 50 C.F.R.§ 10.13. Additionally, the Short-tailed albatross is an endangered species. See Administrative Record at F000313, ECF No. 43-1, PageID # 1697, and at F001879, ECF No. 43-2, PageID # 1786 (citing 65 FR 147: 46643-54).

The permit application argued that the "compelling justification" for it was the economic benefit of having the fishery, given the sales of swordfish and the personal and corporate income derived from those sales, as compared to the "minor way" the fishery contributed to seabird interactions. The permit application noted that, if the fishery were closed, it would likely be replaced with foreign longline vessels that would not use the same "best practices" to reduce seabird interactions

and would not have the same observers.  See Administrative Record
at N009743, ECF No. 48-4, PageID # 2561.  In other words, the
permit application argued that, if the permit were denied, more
migratory birds would be "taken" by foreign vessels not subject
to the same rules applicable to United States vessels.

Because the permit application sought permission to
"take" Short-tailed albatrosses, the FWS examined the effect of
the fishery on them for ESA purposes.  See Biological Opinion
(Birds) of the FWS, Administrative Record at F001861, ECF No. 43-
2, PageID #s 1775.  The Biological Opinion (Birds) noted that,
"[t]o date, there are no documented cases of short-tailed
albatross taken in the Hawaii-based pelagic longline fishery."
Id. at F001889, ECF No. 43-2, PageID # 1796.  Nevertheless, it
stated, "Commercial longline activities pose a threat to the
short-tailed albatross."  Id.  The Biological Opinion (Birds)
assumed that mitigation measures proven effective with respect to
other albatross species would also work with respect to the
Short-tailed albatross.  Id.

FWS examined three alternatives with respect to the
permit application.  The first alternative was to take no action,
thereby denying the permit.  The second alternative was to issue
a permit reflecting the current operation of the fishery,
including the seabird deterrent and mitigation measures, as well
as the observation and reporting requirements.  For stern-

setting, these measures included setting hooks one hour after sunset and retrieving them at least one hour before sunrise to make it harder for the seabirds to see the bait, using thawed bait to cause the hooks to sink faster, using blue-dyed bait to reduce visibility of the bait, maintaining blue dye on the vessel, removing hooks from offal, throwing offal away from where the hooks were being deployed to get the seabirds to go to the offal instead of to the hooks, using certain gear, and following all seabird-handling procedures.  For side-setting, these measures included using certain gear, making sure that the hooks did not resurface, using a bird curtain to keep the birds away as the hooks were being deployed, and following all seabird-handling procedures.  The third alternative was to issue the permit with additional requirements for conducting research and increasing conservation benefits to the seabirds.  See Final EA, Administrative Record at F000330-31 and F000334, ECF No. 43-1, PageID #s 1714-15 and 1718; see also Biological Opinion of FWS, Administrative Record at F001870-72, ECF No. 43-2, PageID #s 1777-79 (describing the effects and purposes of the mitigation measures).

The permit could only be authorized under the "other compelling justification" prong of section 21.27.  As FWS noted, "the commercial fishery carries no intrinsic benefit for migratory bird resources," "the take that occurs is neither

directed by, nor is the result of, important research," and "the take that occurs does not result from concern for individual birds (i.e., relocation or euthanasia)."  See Final EA, Administrative Record at F000312, ECF No. 43-1, PageID # 1696. "Other compelling justification" is not a term defined in the regulation.  FWS, while not expressly saying that any "other compelling justification" authorized the permit, concluded that the permit should issue:

> Because the number of birds reported taken in the fishery is low and the best available scientific information indicates that Layson and Black-footed albatross populations are stable or increasing, our analysis indicates that none of the alternatives [examined] would lead to significant impacts to the birds during the next three years (the term of a Special Purpose permit). . . .  Because none of the alternatives would lead to any operational changes in NMFS's management of the fishery during the life of a permit, no change to the amount or type of take occurring now would result from any of the alternatives, nor would there be major changes in the operation of the fishery or resources expended by NMFS in their management of the fishery.

See Final EA, Administrative Record at F000350, ECF No. 43-1, PageID # 1734.

FWS selected alternative 2 (continuing existing requirements) "because it best meets the purpose and need for our permitting action, would provide better information on seabird mortality and causes than under the no-action alternative, and would have minimal operational impacts and no economic costs to

the fishery within the permit term." Id.  The court infers that FWS determined that the facts presented amounted to an "other compelling justification" for the issuance of the permit.  The court gives substantial deference to this determination because the record establishes that it is a reasonable interpretation of section 21.27.  See Shalala, 514 U.S. at 94-95; Martin, 499 U.S. at 150; Lezama-Garcia, 666 F.3d at 525; Lal, 255 F.3d at 1004 N.3.

FWS issued a Finding of No Significant Impact ("FONSI") with respect to the issuance of the requested permit using the selected alternative, which reflected the current operation of the fishery.  See Administrative Record at F000361-63, ECF No. 48-3, PageID #s 2557-59.

On or about August 24, 2012, FWS issued the special purpose permit to NMFS.  Over the life of the permit, it allowed the "taking" of 191 Black-footed albatross, 430 Laysan albatross, and 1 Short-tailed albatross.  It also allowed 10 Sooty shearwater and 10 Northern fulmar to be taken annually.  See Administrative Record at N010366, ECF No. 42-6, PageID # 1537. The permit defined "taking" as including "entanglement (capture), hooking (capture and/or injury), and injury, as well as killing of birds."  Id. at N010369, ECF No. 42-6, PageID # 1538.  The permit was issued on the condition that all activities be conducted as stated in the application, including the seabird

deterrent measures that had been previously required.  See id. at N010366, ECF No. 42-6, PageID # 1537.  The permit further required NMFS to take steps to reduce "to the maximum degree practicable" future "takes."  Id. at N010369, ECF No. 42-6, PageID # 1538.  It required NMFS to analyze observer data, to keep records of seabird "takes," and to submit annual reports and a final report.  Id.  If the analysis and other information did not lead to modified or new practices, the permit required "study plans" on how to avoid the "taking" of migratory birds and a proposal on how any incidental "take" could be offset or compensated for.  See Administrative Record at N010369, ECF No. 42-6, PageID # 1538.

Plaintiffs argue that the special purpose permit should not have issued because it did not "relate[] to migratory birds" as required by 50 C.F.R. § 21.27.  Plaintiffs appear to be saying that, by allowing the harming of birds, the permit failed to "relate to" birds.  The court rejects this argument.  The "relate to" language in section 21.27 by definition includes the harming of migratory birds.

Viewing the special purpose permit as having issued under the "other compelling justification" prong of section 21.27, this court need not determine whether any other prong of section 21.27 is satisfied.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)

22

(noting that courts reviewing an agency's actions should not attempt to make up for the agency's deficiencies, as they "may not supply a reasoned basis for the agency's action that the agency itself has not given").

Plaintiffs argue that any "other compelling justification" under section 21.27 "must promote bird conservation." <u>See</u> Plaintiffs' Memorandum in Support of Motion at 5-6, ECF No. 30-1, PageID #s 332-33. At most, Plaintiffs point to language in FWS's Final EA that states, "We will issue a special purpose permit only if we determine that the take is compatible with the conservation intent of the MBTA." Administrative Record at F000312, ECF No. 48-2, PageID # 2507. Plaintiffs assert that this position is contradicted by the conclusion in the Final EA that a compelling justification existed for allowing the longline fishing industry to "take" small numbers of migratory birds incidental to the fishing. But any purported contradiction must rest on the assumption that any "take" that is not designed to protect or enhance a species cannot be "compatible" with conservation. It is not clear to the court that this is so. Moreover, even if "taking" during fishing is not compatible with conservation, the Final EA's reference to compatibility cannot, without more, create a regulatory requirement not inherent in the regulation itself.

In arguing that any "other compelling justification" must promote bird conservation, Plaintiffs rely on the _ejusdem generis_ canon of construction.  This canon provides that, when general words follow specific words, the general words are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  <u>Circuit City Stores, Inc. v Adams</u>, 532 U.S. 105, 114-15 (2001).  _Ejusdem generis_ is a "fallback" that aids the court in interpreting a provision.  Because a court relies on a "fallback" as a last resort, the canon is not applied when there are good reasons not to apply it.  <u>See</u> <u>In re United States for an Order Authorizing the Roving Interception of Oral Communications</u>, 349 F.3d 1132, 1142 n.21 (9th Cir. 2003).

The Ninth Circuit explained the _ejusdem generis_ canon of construction in <u>California State Legislative Board, United Transportation Union v. Department of Transportation</u>, 400 F.3d 760, 763 (9th Cir. 2005).  In that case, the Ninth Circuit examined a statute concerning "sleeping quarters."  The statute provided that a "railroad carrier and its officers and agents . . . may provide sleeping quarters (including crew quarters, camp or bunk cars, and trailers)" only when they are "clean, safe, and sanitary," and free from "noise under the control of the carrier."  49 U.S.C. § 21106.  The Ninth Circuit stated, "According to the canon of _ejusdem generis_, the general term

should be defined in light of the specific examples provided."
Id.  Although the reference to "sleeping quarters" could have
included hotels and motels, the Ninth Circuit determined that
"sleeping quarters" as used in the statute was informed by the
examples of "crew quarters, camp or bunk cars, and trailers" such
that "sleeping quarters" for purposes of the statute only
referred to such accommodations owned and operated by the
railroad.  Id.  In so ruling, the Ninth Circuit stated that it
did not matter whether the "general words" preceded or followed
the more specific words.  Id. at 764 n.4.

     Even applying the canon of ejusdem generis to the
regulation in section 21.27, Plaintiffs are incorrect in arguing
that a "compelling justification must promote bird conservation."
Section 21.27 allows a special use permit to issue upon "a
sufficient showing of benefit to the migratory bird resource,
important research reasons, reasons of human concern for
individual birds, or other compelling justification."  Id.  The
common denominator of "showing of benefit to the migratory bird
resource, important research reasons, [or] reasons of human
concern for individual birds" is not the promotion of bird
conservation, as argued by Plaintiffs.  Instead, it is matters
related to migratory birds.

     In In re Indian Gaming Related Cases, 331 F.3d 1094
(9th Cir. 2003), the Ninth Circuit interpreted a statute that

25

discussed the permissible uses of a special distribution fund for which a legislature could appropriate money.  Those uses included:

> (a) grants for programs designed to address gambling addiction;
>
> (b) grants for the support of state and local government agencies impacted by tribal gaming;
>
> (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact;
>
> (d) payment of shortfalls that may occur in the RSTF; and
>
> (e) any other purposes specified by the legislature.

Id. at 1113.  The Ninth Circuit adopted the district court's reliance on the ejusdem generis canon to rule that the reference to "any other purposes specified by the legislature" did not mean that the legislature could appropriate money from the fund for any purpose.  Instead, appropriations had to be "directly related to gaming."  Id.

Similarly, here, any special purpose permit must relate to migratory birds.  The permit does exactly that, imposing restrictions to protect the birds.  That is, the permit requires the lines containing hooks to be deployed after sunset and to be hauled in before sunrise.  It also requires the use of thawed and blue-dyed bait.  Given the relatively small number of anticipated

bird interactions, and the unavoidability of interactions as long as the fishery operated, the agency determined that the permit was justified for the three-year period of the permit.  During that period, observers are to catalog bird interactions with the fishing vessels and make reports to be used to determine whether further mitigation measures are necessary.  FWS's determination that the special purpose permit sufficiently relates to migratory birds for purposes of section 21.27 and FWS's conclusion that the permit is supported by "compelling justification" are entitled to substantial deference as a reasonable interpretation of the regulation under the circumstances.  See Shalala, 514 U.S. at 94-95; Martin, 499 U.S. at 150; Lezama-Garcia, 666 F.3d at 525; Lal, 255 F.3d at 1004 N.3.

The court notes that, when pressed at the hearing to identify any "other compelling justification" not included in the other categories of "showing of benefit to the migratory bird resource, important research reasons, [or] reasons of human concern for individual birds," Plaintiffs could not come up with a single example.  That is, Plaintiffs' reading of "other compelling justification" makes those words redundant.  To avoid rendering "other compelling justification" superfluous, this court should read them as referring to matters outside the other three categories.  See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction

that a statute ought, upon the whole, to be so construed that, if
it can be prevented, no clause, sentence, or word shall be
superfluous, void, or insignificant." (quotation marks and
citation omitted)).

Plaintiffs rely heavily on Center for Biological
Diversity v. Pirie, 191 F. Supp. 2d 161, 173-75 (D.D.C. 2002),
vacated as moot sub nom. 2003 WL 179848 (D.D.C. Jan. 23, 2003)
(noting that an amendment to the MBTA rendered the case moot).
In an order relating to a summary judgment motion, the court
determined that the Navy had violated the MBTA through its
unintentional killing of migratory birds in the course of live-
fire training.  The Navy had applied to FWS for a permit that
would have allowed the killing of the birds incidental to its
live-fire exercises.  Although that permit application had been
turned down, the Navy had conducted its exercises.  Id.  This led
to a preliminary injunction that prevented the Navy from
conducting further exercises.  See Center for Biological
Diversity v. Pirie, 201 F. Supp. 2d 113 (D.D.C. 2002), vacated as
moot sub nom. 2003 WL 179848 (D.D.C. Jan. 23, 2003).  The present
case, unlike Pirie, involves the issuance, not the denial, of a
permit.  At best, Plaintiffs argue that a different result was
reached in Pirie regarding whether to issue a permit for the
incidental "taking" of migratory birds.  However, Pirie does not
require the rejection of every permit application.  Even assuming

28

that the "other compelling justification" is being used here for
the first time to authorize the incidental taking of migratory
birds, that does not mean that the permit in issue is
unauthorized.  The court cannot say that that determination was
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with the law."  See 5 U.S.C. § 706(2)(A).

        Plaintiffs also argue that the special purpose permit
violates Executive Order No. 13186, 66 FR 2853, because it does
not attempt to minimize the "taking" of migratory birds.  That
argument is unpersuasive.  Section 3(a) of Executive Order No.
13186 states:

> Each Federal agency taking actions that have,
> or are likely to have, a measurable negative
> effect on migratory bird populations is
> directed to develop and implement, within
> 2 years, a Memorandum of Understanding (MOU)
> with the Fish and Wildlife Service (Service)
> that shall promote the conservation of
> migratory bird populations.

Section 3(e)(1) of that Executive Order goes on to say that,
pursuant to

> its MOU, each agency shall, to the extent
> permitted by law and subject to the
> availability of appropriations and within
> Administration budgetary limits, and in
> harmony with agency missions:
>
> (1) support the conservation intent of the
> migratory bird conventions by integrating
> bird conservation principles, measures, and
> practices into agency activities and by
> avoiding or minimizing, to the extent
> practicable, adverse impacts on migratory

bird resources when conducting agency
actions[.]

Because Plaintiffs fail to demonstrate that the special purpose

permit has "a measurable negative effect on migratory bird

populations," they fail to demonstrate that the Executive Order

is even applicable.

Even assuming the Executive Order applies, Plaintiffs

fail to show that FWS failed to avoid or minimize, "to the extent

practicable," any adverse impact on migratory birds.  In this

case, for the three-year period of the permit, the status quo is

being maintained.  Although the permit does not require

additional action, such as the side-setting of hooks, it does

require hooks to be deployed after sunset and to be hauled in

before sunrise.  As noted later in this order, requiring side-

setting would have meant going to the Fishery Council to seek an

amendment to its fishery management plan.  The permit also

requires the use of thawed and blue-dyed bait.  Given the minimal

impact on migratory bird populations, the agency determined that

this was acceptable for the three-year period.  As this court has

noted, during that period, observers are to catalog bird

interactions with the fishing vessels and make reports.  These

reports will then be used to determine whether further mitigation

measures are necessary.  This is not agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law."  See 5 U.S.C. § 706(2)(A).

Finally, Intervenor-Defendant Hawaii Longline
Association argues that Plaintiffs' MBTA claims are barred by a
stipulated Consent Decree involving the same parties in an
earlier case.  See Turtle Island Restoration Network, et al. v.
United States Dep't of Commerce, et al., Civ. Nos. 09-00598
DAE/KSC and 10-00044 DAE/KSC, ECF No. 139-1, Jan. 31, 2011.  That
Consent Decree says that "Plaintiffs agree not to bring . . . any
court proceeding that concerns alleged violations of law
identical to or significantly similar to the allegations in
Plaintiffs' complaint."  See id. ¶ 17.  Intervenor-Defendant
fails to demonstrate that claims arising after the Consent Decree
was executed are "identical to or significantly similar" to the
allegations of the earlier action that they are barred here.  The
present case involves a new alleged violation of the MBTA.  The
Consent Decree bars claims for violations "identical to or
significantly similar to the allegations" in the earlier
proceeding, not to all new alleged violations.

To the extent Intervenor-Defendant argues that certain
legal (as opposed to factual) arguments are barred by the Consent
Decree, see ECF No. 41-1, PageID # 1159, Intervenor-Defendant
does not demonstrate that challenges made in the present action
involve matters raised in the previous action.  This court has no
duty to compare the claims raised in the two voluminous records
to itself identify any overlapping issues.  See Local Rule

31

56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").

> **B.   NEPA.**

Plaintiffs' Second Claim for Relief asserts a violation of NEPA, which is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Congress enacted NEPA to ensure that all federal agencies factor environmental considerations into decisionmaking.  To achieve this goal, NEPA requires all federal agencies to prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); <u>Blue Mountains Biodivisity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998).  As the Supreme Court has said:

> [NEPA] ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

<u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989).

When an agency's regulations do not categorically require or exclude the preparation of an EIS, the agency must

prepare an EA to determine whether the action will have a significant effect on the environment.  See 40 C.F.R. § 1501.4; Blue Mountains, 161 F.3d at 1212 ("As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS.").  An EA is less comprehensive and less detailed than an EIS.  It is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  When an EA establishes substantial questions as to whether an agency's action "may have a significant effect upon the human environment, an EIS must be prepared."  Found. for N. Am. Wild Sheep v. United States Dep't of Agric., 681 F.2d 1172, 1178 (9th Cir. 1982).  The EA also "aid[s] an agency's compliance with [NEPA] when no environmental impact statement is necessary" and "facilitate[s] preparation of a statement when one is necessary."  See 40 C.F.R. § 1508.9(a)(2) and (3).

A finding of no significant impact, or "FONSI," is a document prepared by an agency that briefly explains why an action "will not have a significant effect on the human environment" that an EIS is required.  See 40 C.F.R. § 1508.13.

Plaintiffs claim that FWS violated NEPA by failing to "rigorously explore and objectively evaluate all reasonable

alternatives," as required by 40 C.F.R. § 1502.14(a).  However, part 1502 applies to an EIS, not to an EA.  As noted above, an EA is not as comprehensive as an EIS.  An agency has less of an obligation to consider alternatives under an EA than under an EIS.  N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1153 (9th Cir. 2008).  "[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' see 40 C.F.R. § 1502.14(a), with an EA, an agency only is required to include a brief discussion of reasonable alternatives."  Id.; see also 40 C.F.R. § 1508.9(b) (stating that environmental assessments "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted").  Because a Final EA, as opposed to an EIS, was prepared in this case, Plaintiffs' citation to section 1502.14(a) is not persuasive.

Nevertheless, an agency is required to "give full and meaningful consideration to all reasonable alternatives" in an EA, and the "existence of a viable but unexamined alternative renders an EA inadequate."  W. Watersheds Project v Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013) (quotation marks, citation, and alterations omitted).  Although the Final EA in this case examined the alternative of issuing the permit with the condition

34

that research and trials would examine the feasibility and efficacy of seabird deterrent measures such as side-setting or streamer lines, the Final EA did not ultimately require those measures.  The EA reasoned that requiring them of NMFS would require having "the Fishery Council initiate a regulatory amendment to the fishery management plan, as required by the Magnuson-Stevens Act."  See Final EA, Administrative Record at F000331-32, ECF No. 43-1, PageID #s 1715-16.  Plaintiffs contend that excluding consideration of a side-setting requirement violated the agency's duty to consider fully and meaningfully all reasonable alternatives.  This court disagrees.

In Center for Food Safety v. Vilsack, 718 F.3d 829, 842 (9th Cir. 2013), the Ninth Circuit noted that an agency is not required in an EIS to evaluate alternatives outside of its jurisdiction.  That is, matters outside the agency's jurisdiction are not "reasonable alternatives" that an agency must take a hard look at under section 1502.14(a).  Id.  Because an EA does not require as detailed an examination as an EIS, it follows that, if matters outside an agency's jurisdiction are not "reasonable alternatives" that must be examined in an EIS, those same matters are not "reasonable alternatives" that must be examined in an EA.

At the hearing on the present motions, Plaintiffs argued that the Fishery Council (the outside agency) should have been consulted because that process would have taken only four to

six months. Nothing in the record establishes how long it would have taken to consult with the Fishery Council about changing its plan. Even assuming the process would have taken only four to six months, Plaintiffs cite no authority indicating that NEPA requires an agency to examine matters outside the agency's jurisdiction when only four to six months are involved. As a practical matter, an agency cannot be expected to predict how another agency will act or how long another agency's action will take.

**VI.     Sea Turtles.**

   **A.   Endangered Species Act.**

          The Third through Sixth Claims for Relief assert violations of the ESA. The ESA was intended "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA requires all federal departments and agencies to "seek to conserve endangered species and threatened species" and to "utilize their authorities in furtherance of the purposes" of the ESA. 16 U.S.C. § 1531(c)(1).

          Under the ESA, the Secretary of Commerce must determine whether any species is endangered or threatened. See 16 U.S.C. § 1533(a). The leatherback sea turtle is listed as endangered

36

wherever it is found, and the loggerhead sea turtle is listed as endangered in the Pacific Ocean north of the equator but south of 60 degrees north latitude.  See 50 C.F.R. § 224.101(c).

The ESA requires federal agencies, in consultation with the Secretary of Commerce, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."  16 U.S.C. § 1536(a)(2).  "*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  For purposes of § 1536(a)(2), each federal agency is required to "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

As part of its formal consultation, NMFS, Pacific Island Region, issued a Biological Opinion (Turtles) dated January 30, 2012, that determined that lifting the limit on the maximum number of shallow-set longlines that could be deployed annually would not jeopardize the continued existence of the loggerhead sea turtle and leatherback sea turtle species.  See

Administrative Record beginning at N000011, ECF No. 42-2, PageID # 1197; 50 C.F.R. § 402.14(h) (discussing biological opinions).

When a proposed action will not jeopardize the continued existence of a listed species but may result in an incidental "take," a consulting agency must provide an Incidental Take Statement along with the Biological Opinion.  The Incidental Take Statement must specify the impact of the incidental "take" on the species and describe the "reasonable and prudent measures" that are "consider[ed] necessary and appropriate to minimize such impact."  See 16 U.S.C. § 1536(b)(4)(i) to (ii).  Section 1536(b)(4)(iv) requires a written statement that "sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under" § 1536(b)(4)(ii).  "[A]ny taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) . . . shall not be considered to be a prohibited taking of the species concerned."  15 U.S.C. § 1536(o)(2).  In the present case, the Incidental Take Statement and the terms and conditions required are set forth beginning on page 125 of the Biological Opinion (Turtles).  See Administrative Record at N00135-38, ECF No. 42-4, PageID #s 1321-24.

In examining the risk posed to loggerhead sea turtles and leatherback sea turtles by the proposed action (i.e., the continued allowance of Hawaii-based shallow-set longline fishing without a cap on the number of lines set), the Biological Opinion (Turtles) compared estimated turtle deaths to estimated turtle populations.  To do this, NMFS predicted the setting of a maximum of 5,500 lines per year, which was the approximate maximum annual number of sets before the fishery was closed.  See Biological Opinion, Administrative Record at N000015, ECF No. 42-2, PageID # 1201.  Based on the seven years of sea turtle interactions recorded through the 100 percent observer coverage, see Biological Opinion, Table 4 at N00073, ECF No. 42-3, PageID # 1259, NMFS extrapolated the risk to loggerhead and leatherback sea turtles, determining that the proposed action would not jeopardize either species.

### 1.    Loggerhead Sea Turtles.

Loggerhead sea turtles are "slow-growing," reaching sexual maturity at 25 to 37 years of age.  See Biological Opinion (Turtles), ECF No. 42-2, PageID # 1220.  Adults grow to approximately 3 feet in length and 250 pounds.  See Loggerhead Turtle (Caretta caretta), NOAA Fisheries (July 18, 2013) http://www.nmfs.noaa.gov/pr/species/turtles/loggerhead.htm.  Their lifespan is unknown, but there are estimates indicating they may live to be more than 50 years old.  See Loggerhead Sea

Turtle, National Wildlife Federation, https://www.nwf.org/
Wildlife/Wildlife-Library/Amphibians-Reptiles-and-Fish/Sea-Turtle
s/Loggerhead-Sea-Turtle.aspx (last visited Aug. 22, 2013).  The
court cites this information only to provide context, but does
not rely on it in reaching its conclusions.

        Based on observer data from previous years, NMFS
projected that 5,500 line sets would result in approximately 34
loggerhead sea turtle interactions.  See Biological Opinion,
Administrative Record at N000079, ECF No. 42-2, PageID # 1265;
Table 4 at N00073, ECF No. 42-3, PageID # 1259.  Based on "post-
hooking mortality criteria," the Biological Opinion (Turtles)
then predicted that approximately 7 loggerhead turtles (either
sex, all ages) would be killed each year.  Id. at N00080, ECF No.
42-2, PageID # 1266.  Because the only population numbers for
loggerhead sea turtles in the North Pacific Distinct Population
Segment involve adult females (based on counts of females nesting
on beaches),[2] the Biological Opinion (Turtles) converted the

_____

        [2]According to Amendment 18 to the Fishery Management
Plan for Pelagic Fisheries of the Western Pacific Region,
including a Final Supplemental EIS, Regulatory Impact Review, and
Initial Regulatory Flexibility Act Analysis, all of the
loggerhead sea turtles taken in the longline fishery originated
in Japan.  As of 2008, there were approximately 1902 adult female
loggerhead sea turtles nesting in Japan.  See Administrative
Record at 000995 and 000998, ECF No. 43-5, PageID #s 2059 and
2062.  The Biological Opinion (Turtles) stated: "For the 20-year
period 1990-2010, the total number of nests per year for the
North Pacific DPS ranged between 2,064-11,082 nests.  Assuming a
clutch frequency of four per female per year . . . , the number
of nesting females per year between 1990 and 2010 ranged between

overall interaction and mortality rate, determining that approximately 1 adult female would be killed each year.  <u>Id.</u>  To do this, the Biological Opinion (Turtles) assumed that half of the turtles caught were female.  It then looked at the 223 loggerhead sea turtles that had interacted with fishing vessels during the seven years before the fishery was closed, noting that 214 of those were juvenile and unable to reproduce.  <u>Id.</u> at N00080-81, ECF No. 42-2, PageID #s 1266-67.  With juveniles making up 96 percent of the loggerhead sea turtles interacted with, the Biological Opinion (Turtles) rounded the projected deaths of adult female loggerhead sea turtles up to 1.  <u>Id.</u> at N00081, ECF No. 42-2, PageID # 1267.

To determine whether the killing of a single adult female loggerhead sea turtle appreciably reduced the likelihood of survival or recovery of the species in the wild, the Biological Opinion (Turtles) examined two types of Population Viability Assessments (population trends), or "PVAs."  Using nest counts and deaths of adult females, the "classical" Population Viability Assessment predicted that the population of the Pacific loggerhead sea turtle in the North Pacific loggerhead Distinct Population Segment was going to increase significantly by 2110. <u>See</u> Biological Opinion, Administrative Record at N000086, ECF No.

---

516-2771.  <u>See</u> Administrative Record at N000032-33, ECF No. 42-2, PageID #s 1218-19.

42-3, PageID # 1272.  A "climate-based" approach, which examined historic nesting data and "the long-term dynamics of climate forcing on the population," yielded a prediction that the North Pacific loggerhead sea turtle population would decline.  See id. at N000088, ECF No. 42-3, PageID # 1274.  Even assuming a population decline, along with the cumulative effects of worsening climates and increased fishing and ship traffic, the Biological Opinion (Turtles) determined that the small number of interactions and deaths of loggerhead sea turtles would not be "expected to cause an appreciable reduction in the likelihood of both the survival and recovery of the North Pacific loggerhead [Distinct Population Segment] in the wild."  Id. at N00119, ECF No. 42-3, PageID # 1305.  That determination was made "with or without the beneficial effect of spillover," id. at N00119, ECF No. 42-3, PageID # 1305, which is the indirect effect of having fewer turtles harmed by other countries' longline fishing operations if the Hawaii-based operations, with their greater protection of sea life than the foreign operations, increased. See id. at N000074, ECF No. 42-3, PageID # 1260.

Plaintiffs argue that, because loggerhead sea turtles are headed for extinction, the "no jeopardy" determination makes no sense.  According to Plaintiffs, the killing of a single loggerhead sea turtle reduces the likelihood the species will survive.  Of course, nobody wants to see even a single turtle

killed as a result of longline fishing.  But the ESA allows a
proposed action if its impact "is not likely to jeopardize the
continued existence" of the loggerhead sea turtle species.  See
16 U.S.C. § 1536(a)(2).  The court must therefore examine whether
the proposed action "reasonably would be expected, directly or
indirectly, to reduce appreciably the likelihood of both the
survival and recovery of [the loggerhead sea turtle] in the wild
by reducing the reproduction, numbers, or distribution" of it.
50 C.F.R. § 402.02.  Under the circumstances presented here, the
court defers to NMFS's "no jeopardy" determination, having
reviewed NMFS's application of section 402.02 factors.  See
Shalala, 514 U.S. at 94-95; Martin, 499 U.S. at 150; Lezama-
Garcia, 666 F.3d at 525; Lal, 255 F.3d at 1004 N.3.

     Plaintiffs fail to demonstrate that the incidental
killing of a single adult female loggerhead sea turtle per year
would appreciably reduce the likelihood of the loggerhead sea
turtle's survival and recovery in the wild.  At most, Plaintiffs
unpersuasively cite a statistic located on Administrative Record
page N000088, indicating a 4 to 11 percent reduction in
loggerhead sea turtles if the proposed action proceeds.  That
page is part of the Biological Opinion (Turtles) of January 30,
2012, and is cited out of context.  In relevant part, the
Biological Opinion (Turtles) states:

          Depending on the reproductive value assigned
          to the adult female mortality (0, 0.1. 0.3,

43

> 0.5), the additional loss to the loggerhead
> population resulting from the proposed action
> ranges from 4-11 percent.  The model accounts
> not only for the loss of the single adult
> female annually, but also for the loss of her
> reproductive potential, including the lost
> reproductive potential of her unborn
> hatchlings.  However, caution should be
> utilized in interpreting the magnitude of
> this additional loss to the population.  The
> model does not account for the high mortality
> rate expected of these hatchlings from other
> sources, including climate-based threats.
> For these reasons, our qualitative analysis
> focuses more on the model's trend rather than
> its numerical determinations.  This model
> demonstrates that while the direct effect[]
> of the proposed action has a detectable
> influence on the loggerhead population, there
> is no significant difference in the risk of
> extinction between the default, climate-based
> trend and the forecast considering the direct
> effects of the proposed action.

Administrative Record at N000088, ECF No. 42-3, PageID # 1274.[3]

In other words, it is not clear that the incidental killing of a single loggerhead sea turtle will actually result in a 4 to 11 percent reduction of the loggerhead population.  In fact, the Administrative Record suggests that the impact will be much less. Id.  Evidence that the yearly "taking" of a single female loggerhead sea turtle would appreciably reduce the likelihood of the species survival because only a certain number of the species

---

[3]According to Amendment 18 to the Fishery Management Plan for Pelagic Fisheries of the Western Pacific Region Including a Final Supplemental EIS ("SEIS"), Regulatory Impact Review, and Initial Regulatory Flexibility Act Analysis, "it is generally accepted that only 1 turtle out of 1,000 eggs will reach adulthood."  See Administrative Record at 001118, ECF No. 43-6, PageID # 2182.

remains might have been more persuasive.  But Plaintiffs instead rely on a statistic hedged with limitations.

In the final rule listing the loggerhead sea turtle as an endangered species for the North Pacific Ocean Distinct Population Segment, the number of loggerhead sea turtle nests in Japan between 2008 and 2010 ranged from 7,000 to 11,000.  See 76 F.R. 58868, 58900 (Sept. 22, 2011), Administrative Record at N003964, ECF No. 42-6, at PageID # 1466.  Although that same final rule indicates that the nesting population in Japan has declined 50 to 90 percent in the second half of the twentieth century, see id., Plaintiffs have not shown that the incidental killing of 1 of several thousand adult females (which may nest multiple times per year) in the North Pacific Ocean Distinct Population Segment would likely jeopardize the continued existence of the loggerhead sea turtle species.

### 2.   Leatherback Sea Turtles.

Leatherback sea turtles are very large, each growing to be two meters long and weighing approximately 2000 pounds.  See Leatherback Turtle (Dermochelys coriacea), NOAA Fisheries (March 4, 2013), http://www.nmfs.noaa.gov/pr/species/turtles /leatherback.htm.  Their lifespan is unknown.  See Id. However, there are some estimates indicating that leatherback sea turtles can live to be 80 years old.  See, e.g., Giant Leatheback Turtle- -Black Sea Turtle Facts and Photos, Planetsave,

http://planetsave.com/2013/05/12/giant-leatherback-turtle-black-s ea-turtle-facts-and-photos/ (last visited Aug. 22, 2013).  The court cites information on the leatherback sea turtles only to provide some context, but does not rely on the information in reaching its conclusions.

Based on observer data from previous years, the Biological Opinion (Turtles) extrapolated that 5,500 line sets would result in approximately 26 leatherback sea turtle interactions.  See Administrative Record at N000091, ECF No. 42-3, PageID # 1277; Table 4 at N00073, ECF No. 42-3, PageID # 1259. Based on "post-hooking mortality criteria," the Biological Opinion (Turtles) then extrapolated that approximately 6 Western Pacific leatherback sea turtles (either sex, all ages) would be killed each year.  Id. at N00093, ECF No. 42-3, PageID # 1279. Because the available population numbers for leatherback sea turtles measure only adult females (based on counts of females nesting on beaches),[4] the Biological Opinion (Turtles) converted

---

[4]According to Amendment 18 to the Fishery Management Plan for Pelagic Fisheries of the Western Pacific Region, including a Final Supplemental EIS, Regulatory Impact Review, and Initial Regulatory Flexibility Act Analysis, as of 2004, there were approximately 667-879 adult female leatherback sea turtles at the Jumursba-Medi nesting area.  See Administrative Record at 000980, Table 15, ECF No. 43-5, PageID # 2044.  It was far from easy to find nesting data for the Jamursba-Medi component of the Western Pacific Population of leatherback sea turtles in the Administrative Record.  According to a table in a Biological Opinion of October 15, 2008, there were approximately 2,500 nests in 2007.  See Biological Opinion, Figure 4, Oct. 15, 2008, Administrative Record at N005027.  Irene Kelly, a National

the overall interaction and mortality rate.  Id.  To do this, the Biological Opinion (Turtles) estimated that 65 percent of all leatherback sea turtles were female, as studies indicated that the ratio was not 50:50.  Id.  Because the majority of leatherback sea turtles interacted with were adults, the Biological Opinion (Turtles) estimated that the annual number of adult female leatherback sea turtles that would be killed by the fishery would be 4.  Id. at N00094, ECF No. 42-3, PageID # 1280.

There are two distinct populations of leatherback sea turtles in the Western Pacific.  The Jamursba-Medi component makes up 38 percent of the Western Pacific leatherback sea turtle population.  Given migration patterns, most leatherback sea turtle interactions with the fishery come from this group.  See Biological Opinion, Administrative Record at N000097, ECF No. 42-3, PageID # 1283.  Of the 4 anticipated female deaths per year, the Biological Opinion (Turtles) estimated that 2 would come from the Jamursba-Medi population.

---

Oceanic and Atmospheric Administration employee, prepared a document regarding nesting trends.  She notes that, in 2010, there were 1,537 leatherback sea turtle nests at Jamursba-Medi. See Administrative Record at N000995.  The Biological Opinion (Turtles) indicates a range of approximately 5,067 to 9,176 nests from 1999 through 2006 for the Western Pacific population of leatherback sea turtles.  Because each female nests more than once a year, the 2008 Biological Opinion estimated that there were 844 to 3,294 nesting females during that period.  See Administrative Record at N000043, ECF No. 42-2, PageID # 1229.

47

To determine whether the killing of 2 adult female leatherback sea turtles from the Jamursba-Medi population would appreciably reduce the likelihood of survival or recovery of the species in the wild, the Biological Opinion (Turtles) conducted two types of Population Viability Assessments.  Using nest counts and deaths of adult females, the "classical" Population Viability Assessment predicted that the population of the Western Pacific leatherback sea turtles was going to decrease significantly by 2110.  See Administrative Record at N000098, ECF No. 42-3, PageID # 1284.  A "climate-based" approach yielded the prediction that the North Pacific leatherback turtle population would increase.  See id. at N000099, ECF No. 42-3, PageID # 1285.  The Biological Opinion (Turtles) concluded that the proposed action would have a low risk of causing the extinction of the Jamursba-Medi component of the leatherback sea turtle population.  Id. at N000103, ECF No. 42-3, PageID # 1289; and at N000120, ECF No. 42-3, PageID # 1306.

The remaining 62 percent of the leatherback sea turtle population has a lower chance of interacting with the fishery, given migration patterns.  Accordingly, the Biological Opinion (Turtles) determined that there was a "low risk" to this population.  See id. at N000103, ECF No. 42-3, PageID # 1289. Taking into account the larger population of non-Jamursba-Medi leatherback sea turtles as compared to the population of Jamusba-

Medi leatherback sea turtles, the Biological Opinion (Turtles) concluded that 2 adult female deaths would not "appreciably reduce the likelihood of survival of the non-Jamursba-Medi component of the population." See id.

The Biological Opinion (Turtles) examined the cumulative effects of worsening climates and increased fishing and ship traffic, concluding that the small number of interactions and deaths of Western Pacific leatherback sea turtles was not reasonably "expected to cause an appreciable reduction in the likelihood of survival or recovery of the species." Id. at N000123, ECF No. 42-3, PageID # 1309; and at N000124-25, Page ID # 1310-11. NMFS's "no jeopardy" determination as stated in the Biological Opinion (Turtles) stayed the same "with or without the beneficial effect of spillover." Id. at N00125, ECF No. 42-3, PageID # 1311. The court defers to NMFS's reasonable "no jeopardy" determination based on its application of 50 C.F.R. § 402.02. See Shalala, 514 U.S. at 94-95; Martin, 499 U.S. at 150; Lezama-Garcia, 666 F.3d at 525; Lal, 255 F.3d at 1004 n.3.

### 3.   Plaintiffs Do Not Make Their Case.

Citing National Wildlife Federation v. National Marine Fisheries Service, 524 F.3d 917, 930 (9th Cir. 2008), Plaintiffs argue that NMFS violated the ESA by taking action that deepened

the jeopardy to loggerhead and leatherback sea turtles.  However National Wildlife Federation must be read in context.

The ESA requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."  16 U.S.C. § 1536(a)(2).  Regulations interpreting the ESA define "Jeopardiz[ing] the continued existence" of a species as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Plaintiffs correctly cite National Wildlife Federation for the proposition that, "where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm."  524 F.3d at 930.  However, the regulations implementing the ESA make it clear that only actions that "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild" are prohibited.  Thus, when climate conditions jeopardize a species, the ESA does not automatically prohibit the "taking" of a single member of the species.  This is not to say, of course, that dangerous climate conditions give rise to an "open season" on a threatened or endangered species.

50

Instead, the ESA is violated only when agency action results in a "take" that appreciably reduces the likelihood of survival and recovery of a species in the wild.

Under the APA, the court examines whether NMFS acted arbitrarily or capriciously, abused its discretion, or otherwise acted not in accordance with law when it determined that the proposed action of lifting the maximum longline set limit would not jeopardize the continued existence of the loggerhead and leatherneck sea turtle species when "cumulative effects" were considered. See 5 U.S.C. § 706(2)(A); 50 C.F.R. § 402.14(g)(4).

Among other things, Plaintiffs argue that NMFS based its "no jeopardy" conclusion on a determination that the taking of a small number of sea turtles would result in only a minor impact when compared to other environmental causes posing a serious threat to the survival of the species. As Plaintiffs note, the Biological Opinion (Turtles) states that "the expected level of take from the action, including a small number of mortalities, is extremely small when considered together with all impacts considered in the Status of the Species, Baseline and Cumulative Effects . . . ." See Administrative Record at N000119, ECF No. 42-3, PageID # 1305. But that is not all that that section of the Biological Opinion (Turtles) states. That section makes it clear that NMFS did not base its decision solely on the small number of turtles that might be killed. Instead,

NMFS examined a great deal of relevant data, concluding that "the incidental lethal and non-lethal takes of loggerhead turtles associated with the proposed action are not reasonably expected to cause an appreciable reduction in the likelihood of survival of the North Pacific [Distinct Population Segment]." Id. NMFS noted that "any level of take and mortality can have an adverse effect on the overlying population," id., but then applied the ESA's "appreciable reduction" standard to the data before it. Only then did it conclude:

> when considering the effects of the proposed action, together with the status of the listed species, the environmental baseline, and the cumulative effects, we believe that the lethal and non-lethal takes of loggerhead sea turtles associated with the proposed action are not expected to cause an appreciable reduction in the likelihood of both the survival and recovery of the North Pacific loggerhead [Distinct Population Segment] in the wild. We reach our no jeopardy conclusion with or without the beneficial effect of spillover.

Id.

One argument Plaintiffs make is that NMFS acted arbitrarily by analyzing both "classical" and "climate-based" Population Viability Assessments. These approaches resulted in different turtle population estimates, and Plaintiffs say that NMFS arbitrarily "cherry picked" facts to support its conclusion. Despite this accusation, Plaintiffs fail to show on this appeal that NMFS acted arbitrarily. In preparing its jeopardy analysis,

NMFS was required to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Plaintiffs make no showing that, in evaluating both the "classical" and "climate-based" Population Viability Assessments, NMFS failed to examine the best data available.

Plaintiffs argue that, in using a "climate-based" approach to predict that the North Pacific leatherneck sea turtle population would increase, NMFS ignored the "classical" approach's indication that the population would decrease. See id. at N000098-99, ECF No. 42-3, PageID # 1284-85. Plaintiffs argue that, because the "climate-based" approach only predicted the turtle population for the next 25 years, instead of into eternity, the impact of the proposed change after 25 years was not examined. But a decision not to review data for year 26 and beyond does not mean that the "best available data" requirement was violated.

In Bennett v. Spear, 520 U.S. 154, 176 (1997), the Supreme Court stated that the "best available data" requirement is designed "to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." That is, agency determinations may not be based on speculation or surmise or disregard superior data, but imperfections in the available data do not doom an agency's conclusion, as agencies must utilize the best scientific data available, not the best scientific data

possible.  Bldg. Indus, Ass'n of Superior Cal. v. Norton, 247 F.3d 1241, 1246–47 (D.C. Cir. 2001); see also Greenpeace Action v. Franklin, 14 F.3d 1324, 1336 (9th Cir. 1992) (noting that "weak" evidence does not violate the best available data requirement or make an agency's determination "arbitrary and capricious").  The "best available data" requirement does not require an agency to conduct an independent study; it instead requires that the agency not disregard available scientific evidence.  See Am. Wildlands v. Kempthorne, 530 F.3d 991, 998 (D.C. Cir. 2008); Heartwood, Inc. v. U.S. Forest Serv., 380 F.3d 428, 436 (8th Cir. 2004).  In other words, the "best available data" requirement keeps agencies from ignoring available information.  See Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080-81 (9th Cir. 2006).

Plaintiffs fail to show the availability of superior data or data that the agency ignored.  The Biological Opinion (Turtles) says, "The proposed action will have a negligible impact on the risk to the Jamursba-Medi component, the non-Jamursba-Medi component, and therefore the western Pacific leatherback population as a whole."  See Biological Opinion, Administrative Record at N000104, ECF No. 42-3, PageID # 1290.  NMFS's decision not to rely on the "classical" approach to evaluate years 26 and beyond does not mean that NMFS failed to use the best available data.  Instead, NMFS chose to use the

"climate-based" approach as the more accurate approach, even though its prediction went up to only 25 years.

Plaintiffs unpersuasively cite Wild Fish Conservancy v. Salazar, 628 F.3d 513, 525 (9th Cir. 2010), for the proposition that "incomplete information" does not excuse an agency's failure to use the best available evidence.  In that case, the Ninth Circuit held that an examination of 5 years was insufficient. However, the court declined to state the length of time a biological opinion had to cover to be sufficient, stating only that the period covered "must be long enough for the Service to make a meaningful determination as to whether the [proposed action] 'reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery'" of the species.  Id. at 524.  If NMFS had "incomplete information," it was only because the "climate-based" model was not considered accurate beyond year 25.  Because no showing has been made that reliable information beyond year 25 was available or that the 25-year period was not sufficiently long to allow a meaningful determination, and because NMFS determined that the proposed action would have a negligible impact on the risk to leatherback sea turtles as a whole, the court cannot say on this record that the decision to examine only 25 years was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  See 5 U.S.C. § 706(2)(A).  The court defers to NMFS's

determination that 25 years was a sufficient length of time to allow NMFS to make a meaningful jeopardy determination, given the biology and circumstances of turtles.

Plaintiffs also argue that NMFS violated the "best available data" requirement of § 1536(a)(2) by failing to adequately examine whether the proposed action was likely to jeopardize the continued existence of the loggerhead and/or leatherback sea turtles (or result in an adverse modification of their habitat(s)) in light of the effects of global warming. Because NMFS did not develop better, more comprehensive studies regarding the effects of global warming on sea turtles, Plaintiffs say that NMFS violated the "best available data" requirement.  However, as noted above, the "best available data" requirement does not compel an agency to conduct studies; it only requires agencies to "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); Am. Wildlands, 530 F.3d at 998.

The Biological Opinion (Turtles) examined several studies, noted that there was no comprehensive study, and concluded that there is great uncertainty regarding the effects of climate change on turtle populations.  See Administrative Record at N000110, ECF No. 42-3, PageID # 1296.  It noted that rising temperatures may continue to exacerbate a female bias in the sex ratio, could increase embryonic mortality, and might

56

bring on severe storms that could wipe out nesting areas.  See id. at N000109, PageID # 1295.  However, it also noted that sea turtles are "highly mobile and in the past have shown the ability to adapt to changes in their environment and relocate to more suitable foraging and nesting sites."  See id. at N000111, PageID # 1297.  Because Plaintiffs fail to show that the agency ignored specific available data or failed to evaluate specific existing data in reaching its "no jeopardy" conclusions, Plaintiffs are unpersuasive in arguing that the "best available data" requirement was violated.

This court must defer to an agency's determination as to predictions within its area of special expertise, especially when those predictions are "at the frontiers of science."  See Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc., 462 U.S. 87, 103 (1983).  The record does not show that NMFS acted arbitrarily or capriciously, abused its discretion, or otherwise acted not in accordance with the law, when it identified uncertainties in the studies on the effects of global warming on turtles.  See 5 U.S.C. § 706(2)(A).

The regulations implementing the ESA require agencies, as part of their formal consultations, to formulate biological opinions "as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence" of the species "or result in the destruction or

adverse modification of critical habitat."  50 C.F.R.
§ 402.14(g)(4).

The Biological Opinion (Turtles) clearly discusses
"cumulative effects" on the sea turtles.  It notes that climate
change and increased fishing and ship traffic will affect sea
turtles and their habitats.  See Biological Opinion (Turtles),
Administrative Record at N000109, ECF No. 42-3, PageID # 1295.
It was in the context of these cumulative effects that the
Biological Opinion (Turtles) determined that the annual loss of a
single loggerhead sea turtle in connection with longline fishing
would not likely adversely affect the population of North Pacific
loggerhead sea turtles.  See id. at N000117, PageID # 1303.  The
Biological Opinion (Turtles) also determined that the expected
"take" of leatherback sea turtles was extremely small in
comparison to those cumulative effects, so that longline fishing
was not reasonably expected to cause an appreciable reduction in
the likelihood of the survival of the leatherback species.  See
id. at N000119, PageID # 1305.  NMFS cannot be said, under the
circumstances, to have acted arbitrarily or capriciously, to have
abused its discretion, or to have otherwise acted not in
accordance with the law in considering cumulative effects in
making its "no jeopardy" determinations.  See 5 U.S.C.
§ 706(2)(A).

58

Intervenor-Defendant Hawaii Longline Association argues, as it did with MBTA issues, that Plaintiffs' ESA claims are barred by the stipulated Consent Decree involving the same parties in an earlier case.  See Turtle Island Restoration Network, et al. v. United States Dep't of Commerce, et al., Civ. Nos. 09-00598 DAE/KSC and 10-00044 DAE/KSC, ECF No. 139-1, Jan. 31, 2011.  Again, Intervenor-Defendant fails to demonstrate that the Consent Decree bars claims arising after the Consent Decree was executed, and fails to identify specific legal rulings from the earlier case that control here.

## B.    NEPA

Plaintiffs argue that NMFS violated NEPA by failing to prepare a Supplemental EIS ("SEIS").  Plaintiffs say that a Final SEIS was prepared in March 2009 regarding the interaction of up to 16 leatherback sea turtles with the shallow-set longline fishery.  See Administrative Record at N007683 and N007687 n.2, ECF No. 48-8, PageID # 2792 and 2796 n.2.  Plaintiffs had apparently challenged the 2008 Biological Opinion, Administrative Record at 00707, ECF No. 43-4, PageID # 1838, on which that Final SEIS was based.  According to Table 4 of the 2008 Biological Opinion, the proposed action would lead to an estimated 19 interactions annually with leatherback sea turtles.  See 2008 Biological Opinion, Table 4, Administrative Record at 00755, ECF No. 43-4, PageID # 1886.  Those in turn would lead to an

estimated maximum of 5 adult deaths, of which 3 would be of female turtles.  See Administrative Record at 000778, ECF No. 43-4, PageID # 1909.  The uncertainty involved caused the 19 projected interactions to be reduced to 16.  See Final SEIS, Administrative Record at N007687 n.2, ECF No. 48-8, PageID # 2796 n.2.

Following Plaintiffs' challenge, a Consent Decree issued in which NMFS agreed to issue a new Biological Opinion and Incidental Take Statement.  See Request for Consultation, Administrative Record at N000007.  The 2008 Biological Opinion was ultimately superseded by the Biological Opinion (Turtles) of January 30, 2012.  According to Table 4 of that 2012 Biological Opinion (Turtles), about 26 leatherback sea turtle interactions are now projected, not the 19 or 16 contemplated in 2008.  See Biological Opinion, Administrative Record at N000073, ECF No. 42-3, PageID # 1259.  The increase in anticipated turtle interactions appears to reflect increases in turtle interactions that the fishery had from 2009 to 2011.  Id.  The 2012 Biological Opinion (Turtles) estimated that 26 leatherback sea turtle interactions would result in approximately 6 deaths, of which 4 would be of adult females.  Id. at N00094, ECF No. 42-3, PageID # 1280.  The issue before this court is therefore whether an SEIS is required by the increase in estimated annual leatherback interactions from 16 or 19 to 26, with the estimated

corresponding rise in incidental annual killing of adult female leatherback turtles to from 3 to 4.

According to the regulations implementing NEPA, an agency is required to:

> (1) . . . prepare supplements to either draft or final environmental impact statements if:
>
> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

Under section 1502.9(c)(1)(i) of those regulations, whether an agency has made "substantial changes . . . relevant to environmental concerns" requiring an SEIS turns on consideration of whether "(1) the new alternative is a 'minor variation of one of the alternatives discussed in the [previous] EIS,' and (2) the new alternative is 'qualitatively within the spectrum of alternatives that were discussed in the [previous] EIS.'" Great Old Broads for Wilderness v. Kimbell, 709 F.3d 836, 854 (9th Cir. 2013) (quoting Russell Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1045 (9th Cir. 2011) (alterations omitted)). When both factors are satisfied, an SEIS is not required. Id.

NEPA's implementing regulations note that determining whether the "new circumstances or information" are "significant"

under subsection 1502.9(a)(a)(ii) requires consideration of both

context and intensity.  See 40 C.F.R. § 1508.27.  "Context"

refers to the significance of an action "in several contexts such

as society as a whole (human, national), the affected region, the

affected interests, and the locality."  40 C.F.R. § 1508.27(a).

"Intensity" refers to the severity of the impact on a number of

matters such as public health and safety; unique characteristics

of the geographic area; how controversial the effects are; the

uncertainty or uniqueness of the effects; the precedential value;

the cumulative impact of the effects; whether it adversely

affects matters pertaining to the National Register of Historic

Places or matters of significant scientific, cultural, or

historic resources; the adverse effect on threatened or

endangered species or their habitat; and whether an action

threatens a violation of state, federal, or local law.  40 C.F.R.

§ 1508.27(b).

> "An agency must document its decision that no SEIS is
required to ensure that it remains alert to new information that
may alter the results of its original environmental analysis, and
continues to take a hard look at the environmental effects of its
planned action, even after a proposal has received initial
approval."  Great Old Broads, 709 F.3d at 855 (alterations,
quotation marks, and citations omitted).  Here, the decision not
to prepare an SEIS was documented in the Record of Environmental

Consideration of May 2012.  See Administrative Record at N014284-93, ECF No. 42-7, PageID #s 1562-71.

Plaintiffs argue that an SEIS is required in light of "substantial questions" concerning whether the proposed action "may" have a significant effect.  However, Plaintiffs fail to show that whether an action "may" have a significant effect is the standard for triggering the requirement that an SEIS be prepared.  While Plaintiffs cite Steamboaters v. Federal Energy Regulatory Commission, 759 F.2d 1382, 1392 (9th Cir. 1985), for that proposition, that case discusses when an agency must prepare an EIS, not when a supplement to an EIS is necessary.

As discussed in the Record of Environmental Consideration of May 2012, Administrative Record at N014293, ECF No. 42-7, PageID # 1571, the increase in the taking of leatherback sea turtles from 16 to 26 based on new data falls within the exemption from the requirement to supplement.  That is, it is a minor variation of one of the alternatives discussed in the earlier SEIS, and is qualitatively within the spectrum of alternatives discussed in that EIS.  See Great Old Broads, 709 F.3d at 854.  The previous SEIS discussed the proposed action and considered its effects.  Having new data suggesting that about 10 more turtles may be taken or killed annually does not, without more, suggest that the proposed action will likely "jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2).  In fact, Alternative 1E of the previous SEIS examined the effect of having 9,925 sets per year.  See Administrative Record at N007687, ECF No. 48-8, PageID # 2796.  Alternative 1E predicted that, if there were 9,925 sets per year, there would be about 30 leatherback sea turtle interactions with about 7 deaths.  See Administrative Record at N007905, ECF No. 48-8, PageID # 3014.  The 2012 Biological Opinion (Turtles) predicted 26 annual leatherback sea turtle interactions, which is less than the 30 estimated interaction based on 9,925 sets (and the older data regarding interaction rates).  Thus, the 26 interactions can be viewed as having already been considered by the agency as within the spectrum of alternatives previously discussed.  Great Old Broads, 709 F.3d at 854.  To hold otherwise could result in an endless cycle of one SEIS after another with each data change.

     The court defers to NMFS's reasonable determination that no SEIS was necessary under the regulations implementing NEPA.  See Shalala, 514 U.S. at 94-95; Martin, 499 U.S. at 150; Lezama-Garcia, 666 F.3d at 525; Lal, 255 F.3d at 1004 N.3.  Under the circumstances presented here, the court cannot say that the decision not to issue another SEIS was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  See 5 U.S.C. § 706(2)(A).

**VII.      CONCLUSION.**

Because Plaintiffs fail to show that any agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," <u>see</u> 5 U.S.C. § 706(2)(A), the court affirms all of the agency actions challenged in this case. This order terminates all pending motions, and the Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 23, 2013.



 /s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

<u>Turtle Island Restorations Network, et al. v. United States Dep't of Commerce, et al.</u>; Civil No. 12-00594 SOM/RLP; ORDER AFFIRMING THE AGENCIES' DECISIONS